## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FELICIA MARTIN,                              :
*formerly known as Felicia Dantzler*,        :
                                             :
    Plaintiff,              :     Civil Action No.:     11-01069 (RC)
                                             :
    v.                      :     Re Document Nos.:     118, 131
                                             :
DISTRICT OF COLUMBIA, *et al.*,              :
                                             :
    Defendants.             :

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SANCTIONS AND TO STRIKE EXHIBITS

## I. INTRODUCTION

Felicia Martin, an employee of the District of Columbia Alcoholic Beverage Regulation Administration, brought this action against the District and her current and former superiors, asserting statutory and common-law claims arising out of alleged gender, disability, and age discrimination and retaliation. Before the Court are the defendants' motion to dismiss and for summary judgment (ECF No. 118), and Martin's motion for sanctions and to strike exhibits in support of the defendants' motion (ECF No. 131). Having reviewed the parties' filings, the Court grants in part and denies in part the defendants' motion to dismiss and for summary judgment, and denies Martin's motion for sanctions and to strike exhibits.

## II. FACTUAL BACKGROUND[1]

Martin is a female aged forty-five at all times relevant to this case.  *See* Am. Compl. ¶ 2,

ECF No. 33; Defs.' Statement of Facts ¶ 2, ECF No. 118-2.[2]  Since 2007, she has served as an

Investigator in the Enforcement Division of the Alcoholic Beverage Regulation Administration

("ABRA").  *See* Pl.'s Am. Statement of Facts ¶ 1, ECF No. 129; Martin Aff. ¶ 2, Pl.'s Ex. 74,

ECF No. 128-74.  ABRA is an independent agency of the District of Columbia ("District" or

"D.C.") that assists the Alcoholic Beverage Control Board ("ABC Board") in the administration

and enforcement of the District's alcohol regulations.  *See* D.C. Code §§ 25-201(c), 25-202.  In

furtherance of this mission, ABRA Investigators inspect, train, and advise establishments

licensed to provide alcoholic beverages and prepare reports on potential regulatory violations for

submission to the ABC Board.  *See* Investigator job description, Pl.'s Ex. 62, ECF 128-62.

### A. Special Evaluation of ABRA by the D.C. Office of the Inspector General

In 2007 and 2008, several complaints surfaced alleging that ABRA management

improperly interfered with or altered investigative reports.  *See*, *e.g.*, Webb complaint, Pl.'s Ex.

---

[1] In ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Accordingly, where facts are disputed, the Court will view the evidence in the light most favorable to Martin.

[2] The amended complaint alleges that Martin was forty-five years old "at all times material" to this case.  Am. Compl. ¶ 2.  The defendants' Statement of Facts contends that she was aged forty-five "[a]t the time she filed her initial complaint in this action," but cites the relevant portion of the amended complaint and claims that the fact is one of many "not in dispute."  Defs.' Statement of Facts ¶ 2.  Because of the defendants' citation and their claim that Martin's age is undisputed, the Court construes the defendants' Statement of Facts as indicating reliance on the amended complaint's allegation of Martin's age.  Moreover, because Martin does not object, the fact that she was forty-five as relevant to this case will be treated as conceded. *See Trawick v. Hantman*, 151 F. Supp. 2d 54, 59 (D.D.C. 2001) ("[T]he court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." (quoting LCvR 7.1(h))).  Even if Martin were forty-five at the time she filed the complaint in 2011 (and thus even younger in 2008 and 2009, when most of the events at issue occurred), the Court's analysis below would be unchanged.

6, ECF No. 128-6; Anonymous complaint, Pl.'s Ex. 9, ECF No. 128-9.  In response, then-Director of ABRA Maria Delaney ("Delaney") requested that the D.C. Office of the Inspector General ("DCOIG") conduct a special evaluation of ABRA.  *See* DCOIG Report Executive Summary 2, Defs.' Ex. A, ECF No. 118-4.  This evaluation commenced in June 2008 and concluded in April 2009.  *Id.*

Shortly after Delaney announced the forthcoming evaluation, she received an email from Martin asking for "ABRA's contact person responsible for scheduling interviews with OIG." Martin-Delaney emails of June 20, 2008, Pl.'s Ex. 18, ECF No. 128-18.  Delaney replied, explaining that DCOIG would initiate any necessary interview scheduling.  Delaney then forwarded her email exchange with Martin to ABRA Chief of Enforcement Johnnie E. Jackson ("Jackson") with the note "Fyi."  *Id.*

In late June 2008, a DCOIG Special Agent interviewed Martin to gather information regarding allegations that Delaney and Jackson had instructed ABRA staff to destroy evidence relevant to the DCOIG evaluation.  Martin denied having been instructed to destroy documents. However, she reported that on several occasions in the past, Delaney had asked her to change reports citing certain licensees for infractions, and as proof, provided a draft report with Delaney's comments.  Martin alleged that Delaney was motivated by a personal association with the licensees that she sought to protect.  *See* DCOIG Memorandum of Interview, Pl.'s Ex. 20, ECF No. 128-20.  Additionally, Martin claimed that Delaney's favoritism affected not only her reports, but those of all Investigators, who were expected to follow an "unwritten rule in ABRA" that certain licensees should be treated more leniently.  *Id.*

**B.  Denial of Promotion to Supervisory Investigator**

In July 2008, Martin sought a promotion to Supervisory Investigator, applying for one of two vacant positions.  *See* Martin Aff. ¶ 7, Pl.'s Ex. 74; Pl.'s Am. Statement of Facts ¶ 34.  In late October 2008, several Supervisory Investigator candidates were interviewed, but Martin was not among them.  *See* Interview notes, Pl.'s Ex. 39, ECF No. 128-39.  Days later, having heard about the interviews, Martin approached Jackson and asked why she had not been chosen.  *See* Jackson email of Oct. 27, 2008, Pl.'s Ex. 40, ECF No. 128-40.  He explained that because Martin had been promoted in May 2008 to a permanent Investigator position at the G-12 pay grade, Martin Aff. ¶ 3, Pl.'s Ex. 74, she did not have one year's "time in grade" and was thus ineligible for the promotion, *id.* ¶ 16; Jackson Aff. ¶ 3, Defs.' Ex. I, ECF No. 118-12.

Jackson claims that in finding Martin to be ineligible, he relied on advice from the D.C. Department of Human Resources ("DCHR").  *See* Jackson Aff. ¶ 3, Defs.' Ex. I.  In late October 2008, the DCHR generated a Selection Certificate listing three individuals deemed eligible, and Martin's name does not appear on that Certificate.  *See* Selection Certificate, Defs.' Ex. J, ECF No. 118-13.  However, on at least one past occasion, ABRA management had attempted to fill a vacancy by first identifying the candidate it wished to hire, and then asking DCHR to place that candidate's name on a Selection Certificate.  *See* Farouk email of Feb. 15, 2008, Pl.'s Ex. 30, ECF No. 128-30.

Among the candidates interviewed for the promotion in October 2008 were male Investigators Jermaine Matthews ("Matthews") and Gregory Price ("Price"), whose names appeared on the Selection Certificate.  *See* Interview notes, Pl.'s Ex. 39; Selection Certificate, Defs.' Ex. J.  Both Matthews and Price had less than one year's time in grade: Matthews had been promoted in May 2008 to a full-time, DS-11 position, *see* Jackson email of May 21, 2008,

Pl.'s Ex. 32, ECF No. 128-32, whereas Price had been employed with ABRA since February 2008, at the DS-11 pay grade, *see* Price appointment form, Pl.'s Ex. 31, ECF No. 128-31.

In November 2008, Jackson announced that Price had been selected for the promotion to Supervisory Investigator, leaving only one position vacant. *See* Jackson email of Nov. 7, 2008, Pl.'s Ex. 41, ECF No. 128-41. Martin did not apply for the second position because Jackson had led her to believe that her first application would be considered for the other vacancy. *See* Pl.'s Am. Statement of Facts ¶ 46; Jackson email of Dec. 12, 2008, Pl.'s Ex. 43, ECF No. 128-43; Jackson Aff. ¶ 4, Defs.' Ex. I.

In late December 2008, Martin spoke with male Investigator Craig Selby Stewart ("Stewart") at a celebration to mark his departure from ABRA. During their conversation, Martin learned that despite the fact that Stewart had also been ineligible under the time-in-grade rule for the Supervisory Investigator promotion, he had been offered the promotion, though he declined for personal reasons. *See* Martin Aff. ¶ 27, Pl.'s Ex. 74. Ultimately, in November 2009, two additional male Supervisory Investigators were selected—Matthews and Stewart, who by that time had re-joined ABRA. *See* Moosally email of Nov. 10, 2009, Pl.'s Ex. 53, ECF No. 128-53 (announcing promotions); Moosally email of Apr. 10, 2009, Pl.'s Ex. 47, ECF No. 128-47 (announcing Stewart's return to ABRA); Martin Aff. ¶ 52, Pl.'s Ex. 74.[3]

---

[3] After being promoted to Supervisory Investigator in November 2008, Price was dismissed in July 2009 for "inappropriate conduct." Moosally letter, Pl.'s Ex. 31, ECF No. 128-31. Therefore, in the fall of 2009, there were again two vacancies for Supervisory Investigator. *See* Jackson email of Aug. 24, 2009, Pl.'s Ex. 52, ECF 128-52 (announcing two vacancies).

### C.  Denial of Volunteer Assignment as Relief Supervisory Investigator

On several occasions, Martin was not selected for the volunteer position of Relief Supervisory Investigator, despite expressing interest.[4]  In July 2008, Martin volunteered to serve as Relief Supervisory Investigator upon the resignation of a former Supervisory Investigator. Jackson instead appointed Matthews.  *See* Martin Aff. ¶ 5, Pl.'s Ex. 74.  In September 2008, Jackson solicited volunteers to serve as Relief Supervisory Investigator, and Martin expressed her interest.  *See id.* ¶ 9.  Jackson instead selected Stewart.  *See* Jackson email of Oct. 8, 2008, Pl.'s Ex. 37, ECF No. 128-37.  In June 2009, Jackson again asked for volunteers, and Martin again responded affirmatively.  *See* Martin-Jackson emails of June 10, 2009, Pl.'s Ex. 48, ECF No. 128-48.  The next day, Jackson again selected Stewart.  *See* Jackson email of June 11, 2009, Pl.'s Ex. 49, ECF No. 128-49.  At the time, Stewart was either thirty-eight or thirty-nine years old.  *See* DCOHR letter 3, Defs.' Ex. E, ECF No. 118-8 (explaining that at time of the November 2009 promotion, Stewart was thirty-nine years old).  In August 2009, Jackson asked Martin to serve as Relief Supervisory Investigator, but Martin declined on grounds that she did not wish to answer service calls after hours, as required by the position.  *See* Jackson Aff. ¶ 5, Defs.' Ex. I; Hollis Aff. ¶ 10, Defs.' Ex. L, ECF No. 118-15.

### D.  Denial of Other Volunteer Assignments

Martin was also denied various other volunteer positions.  In June 2008, Martin was selected to serve on a committee detailed to the 2009 Presidential Inauguration.  *See* Jackson email of June 21, 2008, Pl.'s Ex. 54, ECF No. 128-54.  However, Martin was removed from the committee after failing to have her photograph taken on a designated day in November 2008, as

---

[4] The amended complaint uses the titles "Relief Supervisory Investigator" and "Acting Supervisory Investigator" interchangeably.  *See* Am. Compl. ¶¶ 24–25.  Because no material difference between the two positions is suggested by the record or by any party, the Court uses the title "Relief Supervisory Investigator" for simplicity.

required for participation per certain security measures.  *See* Martin-Jackson emails of Nov. 19–20, 2008, Defs.' Ex. N, ECF No. 118-17; Jackson Aff. ¶ 6, Defs.' Ex. I.  Although there was a make-up appointment for taking the required photographs, Martin was unaware of anyone who had their photo taken on the make-up day.  *See* Martin Dep. 89: 17–21, Defs.' Ex. B, ECF No. 118-5.

In September 2008, Jackson asked for volunteers to serve as Training Coordinator, Fleet Coordinator, and Special Events Coordinator.  *See* Martin-Jackson emails of Sept. 19–24, 2008, Pl.'s Ex. 56, ECF No. 128-56.  These volunteers would take on additional duties to improve the Enforcement Division's operations and would in turn gain management and leadership experience.  *See* Martin Aff. ¶ 11, Pl.'s Ex. 74; Jackson Aff. ¶ 10, Defs.' Ex. I.  Jackson did not specify any selection criteria.  *See* Martin-Jackson emails of Sept. 19–24, 2008, Pl.'s Ex. 56.  Despite expressing interest in all three positions, Martin was not selected for any.  *See id.*; Martin Aff. ¶ 11, Pl.'s Ex. 74.  The two females selected as Training and Special Events Coordinators were under age forty, while the male selected as Fleet Coordinator was sixty-two years old.  *See* Pl.'s Am. Statement of Facts ¶ 53.

Also in September 2008, Jackson asked for volunteers to serve as Inaugural Liaison to help coordinate activities and submission of documents on behalf of ABRA's detail for the 2009 Presidential Inauguration.  Martin volunteered.  *See* Martin-Jackson emails of Sept. 11, 2008, Pl.'s Ex. 55, ECF No. 128-55.  Minutes later, however, Jackson announced that male Investigators Dwyne Shoemaker and Price would serve as the Liaisons.  *See id.*

### E.  Carpal Tunnel Syndrome

In December 2008, Martin was diagnosed with carpal tunnel syndrome, a condition that limits her ability to type.  *See* Dr. Mody Letter, Pl.'s Ex. 59, ECF No. 128-59; Jackson memo,

Pl.'s Ex. 60, ECF No. 128-60.  Typing is a significant part of an Investigator's job: Investigators must resolve virtually all complaints of regulatory violations by means of a written report, and Martin handled 96 to 162 cases per year.  *See* Martin letter of Jan. 2, 2012, Pl.'s Ex. 62, ECF No. 128-62; Investigator job description, *id.*  In December 2008, when Martin reported her condition to Jackson, he accused her of having a pre-existing condition and of "dropping [her] injury in ABRA's lap."  Martin Aff. ¶ 22, Pl.'s Ex. 74.  ABRA then provided Martin with a cassette recorder "to be utilized to dictate her investigative reports," though Martin had requested voice recognition software.  Jackson memo, Pl.'s Ex. 60; Jackson memo, Pl.'s Ex. 59, ECF No. 128-59; *see also* Defs.' Statement of Facts ¶ 41.  That same month, Jackson decided to divert cases away from Martin on the basis that she could no longer type.  *See* Nickens Aff. ¶ 6, Pl.'s Ex. 58, ECF No. 58.  By January 2009, Martin had no cases assigned to her, *see* Martin email of Jan. 8, 2009, Pl.'s Ex. 57, ECF No. 128-57, and this workload reduction persisted into August 2010, *see* Martin Aff. ¶ 90, Pl.'s Ex. 74 ("I did not have enough work to sustain me thru [sic] the 8 hour tour.").  Also in January 2009, Jackson instructed another Investigator to type Martin's cases for her, though such duties would be additional to his normal work assignments.  *See* Nickens Aff. ¶ 7, Pl.'s Ex. 58.

Martin's symptoms did not abate.  In 2010, Martin inquired on several occasions about the availability of voice recognition software, explaining that the cassette recorder was of no help in sending emails on a daily basis.  *See* Martin correspondence, Pl.'s Ex. 64, ECF No. 128-64.  In July 2010, Supervisory Investigator Stewart confirmed to Martin that Jackson had declined to purchase the requested software and that she consequently had to use the cassette recorder.  *See* Martin Aff. ¶ 84, Pl.'s Ex. 74.  In early 2011, Martin underwent surgery for her condition and attended occupational therapy sessions.  *See* Medical records, Pl.'s Ex. 76, ECF No. 128-76.  In

September 2011, her doctor instructed her to limit working hours, computer usage, and other physical tasks such as lifting, standing, walking, sitting, and driving.  *See* Dr. Mosely recommendations, Pl.'s Ex. 65, ECF No. 128-65.  ABRA eventually provided Martin with voice recognition software in December 2011.  Martin Dep. 33:17–18, Defs.' Ex. Q, ECF No. 118-20; Defs.' Statement of Facts ¶ 44.[5]

### F.  Denial of Overtime Pay

In July 2009, Martin signed up to work an overtime shift.  During the shift, she and other colleagues met Matthews, who was riding in a separate vehicle and at the time was serving as Relief Supervisory Investigator.  Upon seeing the number of people on the shift, Matthews stated that he "was not paying overtime for . . . five people" and that "one of [them] had to leave." Martin Aff. ¶ 37, Pl.'s Ex. 74.  However, no one departed, given that each believed that they had been properly approved to work.  *Id.*  Martin later learned that her name was not on the "overtime list" and that she would not be paid for the overtime hours.  *Id.*  According to Jackson, Martin had failed to obtain written advance approval by a Supervisory Investigator for her work on the overtime shift, per ABRA policy.  *See* Jackson Aff. ¶ 8, Defs.' Ex. I.

### G.  Procedural History

In November 2009, Martin met with ABRA's internal Equal Employment Opportunity ("EEO") Officer to discuss the possibility of filing a discrimination complaint.  Martin Aff. ¶ 54, Pl.'s Ex. 74.  She subsequently filed an internal EEO complaint.  *See id.* ¶ 57.

---

[5] During her deposition, Martin initially recalled that "two years" elapsed between her receipt of the tape recorder and of the voice recognition software, but she then claimed that "actually three" years had passed.  Martin Dep. 33:17–18, Defs.' Ex. Q.  Because the Court must view the evidence in the light most favorable to Martin, the Court presumes that she received the software three years after receiving the tape recorder—that is, in December 2011.

In February 2010, Martin filed a formal charge alleging gender, disability, and age discrimination under the D.C. Human Rights Act ("DCHRA"), D.C. Code §§ 2–1401.01 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, with the D.C. Office of Human Rights ("DCOHR") and the U.S. Equal Employment Opportunity Commission ("EEOC").  *See* Charges, Pl.'s Ex. 68, ECF No. 128-68.[6]  In July 2010, Martin filed with both agencies a separate retaliation complaint under the DCHRA and Title VII, alleging that she had suffered retaliation for her discrimination complaints.  *See id.*  In August 2010, the DCOHR issued a no-cause finding on Martin's discrimination claims.  *See* DCOHR letter, Defs.' Ex. E; Martin Aff. ¶ 110, Pl.'s Ex. 74.  In December 2010, Martin withdrew her retaliation complaint from the DCOHR administrative process.  *See* Request for Withdrawal, Defs.' Ex. F, ECF No. 118-9.  In March 2011, Martin received a notice from the EEOC of the dismissal of her discrimination claims and of her right to file a lawsuit, explaining that the EEOC had adopted the findings of the DCOHR.  *See* Compl. Ex. A, ECF No. 1-1.

On June 9, 2011, Martin filed the instant action.  *See generally* Compl., ECF No. 1.  Her amended complaint asserts claims under Title VII; the DCHRA; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*; the D.C. Whistleblower Protection Act ("DCWPA"), D.C. Code §§ 1–615.51 *et seq.*; and the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("§ 1983"); along with other statutory and common law claims. *See generally* Am. Compl.  In addition to the District, the amended complaint names as

_____

[6] Martin claims in her affidavit that she filed the formal charge in December 2009. Martin Aff. ¶ 61, Pl.'s Ex. 74.  The amended complaint attempts to explain the discrepancy: Although she filed the charge in December 2009, it was not formally docketed until February 2010.  *See* Am. Compl. ¶ 71.  In this factual overview, the Court opts for the February 2010 date, which appears on the face of the DCOHR charge, but in any event, the discrepancy does not impact the Court's analysis.  *See* Charges, Pl.'s Ex. 68.

defendants various ABRA personnel in their individual capacities, including Jackson, Delaney, and Stewart, who by then was Martin's direct supervisor.  The other two individual defendants are Frederick Peter Moosally, III ("Moosally"), who had become ABRA Director in July 2009 after Delaney resigned, and former Chairman of the ABC Board Charles Brodsky ("Brodsky"). *See generally* Am. Compl.  This Court subsequently dismissed or granted summary judgment on all claims against Brodsky.  *See Martin v. District of Columbia*, 968 F. Supp. 2d 159, 161 (D.D.C. 2013) (ECF No. 99).  Accordingly, the remaining defendants are the District, Moosally, Jackson, Stewart, and Delaney (collectively "Defendants").

During the pendency of this litigation, in March 2012, Martin filed a second retaliation complaint with the DCOHR and EEOC, alleging retaliation for both this lawsuit and her earlier discrimination complaints.  *See* Charge, Defs.' Ex. G, ECF No. 118-10.  In May 2014, the DCOHR issued a no-cause finding on this retaliation claim.  *See* DCOHR letter, Defs.' Ex. H, ECF No. 118-11.

Subsequently, Defendants moved to dismiss and for summary judgment on Martin's outstanding claims.  *See* ECF No. 118.  After Martin filed her opposition and Defendants replied, Martin moved for sanctions and to strike certain exhibits in support of Defendants' motion, alleging that Defendants had failed to disclose those exhibits during discovery, in violation of Federal Rule of Civil Procedure 37(c)(1).  *See* ECF No. 131.  Both motions are now ripe for adjudication.

## III.  LEGAL STANDARDS

Federal Rule of Civil Procedure 37(c)(1) provides that a party who "fails to provide information or identify a witness as required by Rule 26(a) or (e) . . . is not allowed to use that

information or witness to supply evidence on a motion . . . , unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted); *see also* Fed. R. Civ. P. 12(b)(6).  A court need not accept as true a plaintiff's legal conclusions or "naked assertions devoid of further factual enhancement."  *Iqbal*, 556 U.S. at 678 (citation, alterations, and internal quotation marks omitted).

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party moving for summary judgment bears the "initial responsibility" of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In response, the non-moving party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (citation and internal quotation marks omitted).  In determining whether a genuine issue exists, a court must refrain from making credibility determinations or weighing the evidence; rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV.  ANALYSIS

Martin's remaining claims are those brought against the District (All Counts); against Moosally (Counts Four, Five, Seven, Eight, Nine, Eleven, and Twelve); and against Jackson, Stewart, and Delaney (Counts Four, Five, Eight, Nine, Eleven, and Twelve).  Defendants have

moved to dismiss or for summary judgment on all of these counts.  Martin has moved for sanctions and to strike exhibits in support of Defendants' motion.  Because the disposition of Martin's motion could potentially affect the Court's assessment of Defendants' motion, the Court addresses Martin's motion first.

### A.  Martin's Motion for Sanctions and to Strike Exhibits

Martin moves under Federal Rule of Civil Procedure 37(c) to strike certain exhibits in support of Defendants' motion to dismiss and for summary judgment, and for other sanctions as this Court deems appropriate.  *See* Pl.'s Mot. Sanctions & Strike Exs., ECF No. 131.  Martin contends that the exhibits at issue were not disclosed by Defendants as required by Rule 26(a)(1), and that Rule 37(c) sanctions are warranted because the failure to disclose was not harmless.  *See id.* at 7–8; Fed. R. Civ. P. 37(c).[7]  Defendants concede that they failed to file their Rule 26(a)(1) initial disclosure but argue that Martin's motion is untimely and, alternatively, that the lack of disclosure was harmless.  *See* Opp'n Pl.'s Mot. Sanctions 1–3, ECF No. 132.

The Court declines to strike exhibits or impose any sanctions.  First, Martin's motion was not timely.  "The timeliness of a [Rule 37(c)] motion for sanctions depends on such factors as when the movant learned of the discovery violation, how long he waited before bringing it to the court's attention, and whether discovery has been completed."  *Long v. Howard Univ.*, 561 F. Supp. 2d 85, 91 (D.D.C. 2008).  Here, Martin learned of the discovery violation in April 2012 and waited over two years—until after discovery had closed (and after summary judgment briefing had concluded)—to move for sanctions.  *See* Opp'n Pl.'s Mot. Sanctions 2.

---

[7] Rule 26(a)(1) imposes on parties a general duty to disclose individuals and documents supporting claims and defenses.  *See* Fed. R. Civ. P. 26(a)(1).  The parties agreed in their Joint Meet and Confer Statement to provide initial disclosures under Rule 26(a)(1).  *See* Joint Meet & Confer Statement 4, ECF No. 26.

Moreover, Martin has failed to establish that Defendants' discovery violation prejudiced her. *See* Fed. R. Civ. P. 37(c)(1) (authorizing exclusion of undisclosed evidence "unless the failure [to disclose] . . . is harmless"). As Defendants explain, most of the exhibits that Martin seeks to strike were produced during discovery by Martin herself.[8] Of the three exhibits that were not, only one was not produced during discovery by Defendants—the no-cause finding determination sent to Martin from the DCOHR. *See* DCOHR letter, Defs.' Ex. H. This omission is understandable: The letter, dated May 14, 2014, did not exist when discovery closed in February 2014. *See id.*; Minute Order of Jan. 28, 2014 (extending discovery deadline to February 28, 2014). Furthermore, the letter was addressed to Martin, who presumably was fully aware of its content before Defendants filed it as a supporting exhibit. *See* DCOHR letter, Defs.' Ex. H.

Martin's only concrete assertion of prejudice is that she was unable to examine Jackson about his affidavit because she allegedly did not receive the affidavit prior to his deposition. *See* Pl.'s Mot. Sanctions & Strike Exs. 8 (citing *Wannall v. Honeywell Int'l, Inc.*, 292 F.R.D. 26, 36 (D.D.C. 2013) (holding that party was prejudiced "by being unable to cross-examine [expert witness] about his new opinions" disclosed only after discovery)). Martin's contention is unfounded: She possessed a copy of the Jackson affidavit prior to discovery, as she subsequently produced it to Defendants.[9] Moreover, in their discovery responses, Defendants also provided Martin with a copy of the same affidavit. *See* Opp'n Pl.'s Mot. Sanctions 3.

---

[8] Martin asks the Court to strike Defendants' Exhibits A, D, E, F, H, I, J, K, L, M, N, O, and P. *See* Pl.'s Mot. Sanctions & Strike Exs. 9. The only exhibits *not* produced by Martin during discovery were Exhibits F (Plaintiff's EEOC Charge), H (Letter of Determination from DCOHR), and J (material from selection file). *See* Opp'n Pl.'s Mot. Sanctions 2–3 & n.1.

[9] Defendants explain, without response from Martin, that all Bates numbers with a "P" prefix were produced by Martin during discovery. *See* Opp'n Pl.'s Mot. Sanctions 2 n.1. "P" Bates numbers clearly appear on the Jackson affidavit. *See* Jackson Aff., Defs.' Ex. I.

Accordingly, the Court denies Martin's motion for sanctions and to strike exhibits in support of Defendants' motion.

## B. Disparate Treatment on the Basis of Gender in Violation of Title VII, of Disability in Violation of the ADA, and of Age in Violation of the ADEA (Counts One, Five, and Ten)

Martin alleges that the District discriminated against her on the basis of her gender, disability, and age, in violation of Title VII, the ADA, and the ADEA, respectively. Because her claims of gender, disability, and age discrimination are premised on many of the same factual allegations related to promotion, training, work assignments, volunteer opportunities, overtime pay, and other work benefits, the Court proceeds by analyzing each set of factual allegations under the relevant legal theories. *See* Am. Compl. ¶¶ 119–23, 139–41, 197–200.

## 1. Legal Framework for Disparate-Treatment Discrimination under Title VII, the ADA, and the ADEA

Title VII makes it unlawful for an employer to discriminate against an individual "because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e–2(a)(1), (2). Such discrimination includes "fail[ing] or refus[ing] to hire . . . any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment" or "limit[ing] . . . his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee . . . ." *Id.*

Where a Title VII plaintiff proffers "only indirect evidence" of discrimination, courts apply the three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green. Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003). Under *McDonnell Douglas*, the plaintiff must first

establish a prima facie case of discrimination; the employer then must articulate a legitimate,

nondiscriminatory reason for its action; and finally, the plaintiff must show that the employer's

reason was a pretextual cover for discrimination.  411 U.S. 792, 802–805 (1973).  A plaintiff

"makes out a prima facie case of disparate-treatment discrimination by establishing that: (1) she

is a member of a protected class; (2) she suffered an adverse employment action; and (3) the

unfavorable action gives rise to an inference of discrimination."  *Czekalski v. Peters*, 475 F.3d

360, 364 (D.C. Cir. 2007) (citation and internal quotation marks omitted).[10]   In the context of a

failure to hire or promote, an inference of discrimination can be established by a plaintiff's

elimination of "the two most common legitimate reasons . . . to reject a job applicant: an absolute

or relative lack of qualifications or the absence of a vacancy in the job sought."  *Stella v. Mineta*,

284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S.

324, 358 n.44 (1977)).

Where a plaintiff has suffered an "adverse employment action" and her employer asserts

a "legitimate, non-discriminatory reason" for the alleged discrimination, the district court must

forgo the *McDonnell Douglas* burden-shifting framework.  *Brady v. Office of Sergeant at Arms*,

520 F.3d 490, 494 (D.C. Cir. 2008).  Instead, at summary judgment, "the district court must

resolve one central question: Has the employee produced sufficient evidence for a reasonable

---

[10] Martin cites another formulation of the prima facie case applicable in assessing a denial of promotion.  *See* Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 3 (explaining four-part prima facie case—membership in protected class, existence of open position, qualification for position, and rejection under circumstances giving rise to inference of discrimination).  The Court opts for the *Czekalski* formulation given its broader applicability for other claims in this case.  *See also Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 n.1 (D.C. Cir. 2008) (reviewing varying formulations of the prima facie case); *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (applying three-part prima facie case in analyzing non-selection discrimination claim); 1 Barbara T. Lindemann, Paul Grossman & C. Geoffrey Weirich, Employment Discrimination Law 2-4 (5th ed. 2012) (describing prima facie case as "fluid" and "adapt[able] . . . to the facts of the particular case").

jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of . . . sex . . . ?" *Id.* A plaintiff can demonstrate that the employer's stated reason was "not the actual reason" by "produc[ing] evidence suggesting that the employer treated other employees of a different . . . sex . . . more favorably in the same factual circumstances" or by showing that the employer "is making up or lying about the underlying facts . . . ." *Id.* at 495. "If the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Id.* (citing *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false.")).

Under *Brady*, the prima facie case still plays a role under certain circumstances. Where an employer offers no nondiscriminatory reason for its actions, a plaintiff must still make out a prima facie case. *See Brady*, 520 F.3d at 494 n.2 (explaining that prima facie case still "matters" where "defendant does not assert *any* legitimate, nondiscriminatory reason for the decision"). Additionally, when a plaintiff successfully demonstrates that an employer's proffered nondiscriminatory reason is "not the actual reason," the plaintiff must still show that "the employer intentionally discriminated against the employee on the basis of . . . sex . . . [.]" *Id.* at 494.[11]  In deciding this latter issue, "courts since *Brady* have used evidence from the prima facie case (without deciding whether there is one or not) as well as evidence of pretext . . . ." *Pederson v. Mills*, 636 F. Supp. 2d 78, 82 n.2 (D.D.C. 2009) (explaining that *Brady*

---

[11] The D.C. Circuit recently reaffirmed the principle that at summary judgment, the pretext inquiry under *Brady* requires that the plaintiff proffer evidence of "demonstrably discriminatory motive." *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014) (citation omitted).

"broaden[ed]" the summary judgment inquiry); *see also Evans v. District of Columbia*, 754 F.

Supp. 2d 30, 44 (D.D.C. 2010) ("The evidence to consider [in resolving *Brady*'s central inquiry]

includes (1) the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the

employer's proffered explanation, and (3) any further evidence of discrimination that may be

available to the plaintiff.").

Under Section 102 of the ADA, "[n]o covered entity shall discriminate against a qualified

individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The EEOC regulations

elaborate on the scope of such discrimination, prohibiting discrimination "in regard to . . .

promotion, . . . [j]ob assignments, . . . training, . . . [and] [a]ny other term, condition, or privilege

of employment."  29 C.F.R. § 1630.4(a)(1)(ii), (iv), (vii), (ix).  To make out a prima facie case of

discrimination under the ADA, the plaintiff must show that "he had a disability within the

meaning of the ADA, that he was 'qualified' for the position with or without a reasonable

accommodation, and that he suffered an adverse employment action because of his disability."

*Swanks v. Wash. Metro. Area Transit Auth.*, 179 F.3d 929, 934 (D.C. Cir. 1999).

The ADEA makes it unlawful for an employer to discriminate against an individual

"because of such individual's age."  29 U.S.C. § 623(a)(1), (2).  As with Title VII, such

discrimination includes "fail[ing] or refus[ing] to hire . . . any individual, or otherwise

discriminat[ing] against any individual with respect to his compensation, terms, conditions, or

privileges of employment" or "limit[ing] . . . his employees . . . in any way which would deprive

or tend to deprive any individual of employment opportunities or otherwise adversely affect his

status as an employee . . . ."  *Id.*  To establish a failure-to-hire prima facie case under the ADEA,

the plaintiff must show that "1) she is a member of the protected class (*i.e.*, over 40 years of age); (2) she was qualified for the position for which she applied; (3) she was not hired; and (4) she was disadvantaged in favor of a younger person." *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1155 (D.C. Cir. 2004); *see also* 29 U.S.C. § 631(a) (providing that ADEA protects individuals "who are at least 40 years of age"). "The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). However, an inference of discrimination cannot be drawn from the fact that a plaintiff lost out to an "insignificantly younger" individual. *Id.* at 313.

The *Brady* framework governs ADEA and ADA disparate-treatment discrimination claims. *See Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (ADEA); *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (ADA). That is, "[o]nce an employer has offered a legitimate reason for an [adverse employment action], the question at the summary judgment stage is whether the employee has produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of . . . age" or disability. *Barnett*, 715 F.3d at 358 (citation and internal quotation marks omitted).[12]

---

[12] In *Gross v. FBL Financial Services, Inc.*, the Supreme Court held that a plaintiff bringing an age discrimination claim under the ADEA must show that age was the "but-for" cause of the challenged action. 557 U.S. 167, 177–78 (2009); *accord Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 376 (D.C. Cir. 2010). *Gross* did not, however, address whether the *McDonnell Douglas* framework governs the ADEA. *See Gross*, 557 U.S. at 175 n.2. But given that *Gross* concerned the ultimate burden of persuasion, and not the burdens of production (the role of the *McDonnell Douglas* framework), the "but-for" causation requirement of *Gross* impacts neither the prima facie case elements nor *McDonnell Douglas*'s applicability in the ADEA context. *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (explaining that *Gross* "stands for the proposition that it is improper to shift the burden of

## 2.  Reduction in Work Assignments[13]

In Count Five, Martin alleges that her work assignments were reduced on account of her carpal tunnel syndrome, in violation of the ADA.  *See* Am. Compl. ¶ 141.  In Count One, Martin asserts that her gender was also a basis for discrimination as to her "work assignments," in violation of Title VII.  *See* Am. Compl. ¶ 120.[14]

At the outset, the Court dismisses the ADA claim—Count Five—as to defendants Moosally, Jackson, Stewart, and Delaney.  As the Court explained in dismissing the same count against Brodsky, "[t]here is no liability under the ADA for a person in his individual capacity." *Martin*, 968 F. Supp. 2d at 166 (citing *Cooke-Seals v. District of Columbia*, 973 F. Supp. 184, 186–87 (D.D.C. 1997)).[15]  As with Brodsky, the amended complaint names Moosally, Jackson,

---

persuasion to the defendant" and reviewing cases that leave intact the *McDonnell Douglas* framework in ADEA cases).

[13] While the Court's discussion of various alleged adverse employment actions generally proceeded in chronological order in the factual overview, *see supra* Part II, the Court here addresses the denial of work assignments first, given that the central question implicated— whether Martin was a "qualified individual with a disability" under the ADA—in turn impacts the disposition of other disparate treatment claims addressed below.  Additionally, although Defendants' arguments on this question were made in response to Martin's failure-to-accommodate claims in Counts Five and Six, the Court addresses them here.  *See* Mem. Supp. Mot. Dismiss & Summ. J. 17.

[14] Count Ten does not allege that Martin lost work assignments on account of her age. *See* Am. Compl. ¶¶ 197–200.  Even if the complaint were so amended, the claim would not survive summary judgment because Martin has not introduced any evidence that she was "disadvantaged in favor of a younger person."  *Teneyck*, 365 F.3d at 1155.  Presumably, Nickens was the beneficiary of the alleged discrimination, given that he took over Martin's cases, but the record is silent as to his age.  *See* Nickens Aff. ¶ 6, Pl.'s Ex. 58.

[15] *Cooke-Seals* applied to the ADA the rule of *Gary v. Long*, in which the D.C. Circuit affirmed dismissal of claim against a supervisory employee sued in his personal capacity and held that "while a supervisory employee may be joined as a party defendant in a Title VII action, that employee must be viewed as being sued in his capacity as the agent of the employer, who is alone liable for a violation of Title VII."  59 F.3d 1391, 1399 (D.C. Cir. 1995).  Martin's response does not dispute that summary judgment is proper as to her ADA claims against the individual defendants; rather, she contends only that this Court should not grant summary

Stewart, and Delaney as defendants only in their "individual capacit[ies]." *See* Am. Compl. 1–2. Thus, the District is the only remaining defendant in Count Five.[16]

### a. Disability Discrimination under the ADA

In its motion, the District neither asserts a nondiscriminatory reason for Martin's workload reduction, nor contests record evidence that the reduction was motivated by Martin's carpal tunnel syndrome and that it lasted at least through August 2010. *See* Nickens Aff. ¶ 6, Pl.'s Ex. 58 ("[Jackson] stated that if [Martin] could not type she could not get any cases."); Martin Aff. ¶¶ 29, 90, Pl.'s Ex. 74; *see also* 29 C.F.R. § 1630.4(a)(1)(iv) (prohibiting discrimination as to "job assignments"). Rather, the District attacks Martin's prima facie case, contending that Martin's carpal tunnel syndrome did not constitute a "disability" under the ADA. *See* Mem. Supp. Mot. Dismiss & Summ. J. 17.

The ADA provides that no covered entity shall "discriminate against a qualified individual on the basis of disability . . . ." 42 U.S.C. § 12112(a). A "qualified individual" means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position . . . ." *Id.* § 12111(8). The term "disability" refers to, among other things, "a physical or mental impairment that substantially limits one or more major life activities," *id.* § 12102(1)(A), and "major life activities" include tasks such as "performing manual tasks, . . . lifting, . . . communicating, and working," *id.* § 12102(2)(A).

In contending that Martin's carpal tunnel syndrome cannot constitute a disability, the District invokes a Ninth Circuit opinion for the proposition that typing does not qualify as a "major life activity." Mem. Supp. Mot. Dismiss & Summ. J. 17 (citing *Thornton v. McClatchy*

---

judgment on her ADA claim against the District. *See* Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 17–20.

[16] Below, the Court separately discusses the failure-to-accommodate claims in Count Five. *See infra* Part IV.E.

*Newspapers, Inc.*, 292 F.3d 1045, 1046 (9th Cir. 2002)); *see also* 42 U.S.C. § 12102(1)(A).[17]

That Ninth Circuit decision in turn relied on *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), in which the Supreme Court explained that "to be substantially limited in performing manual tasks"—one category of "major life activity" provided in the statute—"an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance in most people's daily lives." *Thornton*, 292 F.3d at 1046 (quoting *Williams*, 534 U.S. at 198).

Subsequently, however, Congress expressly rejected the *Williams* Court's narrow interpretation of "disability" under the ADA, as explained in the "Findings and Purposes" section of the ADA Amendments Act of 2008 ("ADAA"). *See* ADAA, Pub. L. No. 110-325, § 2(b)(4), 122 Stat. 3553, 3554 (2008). As amended, the ADA expressly provides that the term "disability" "shall be construed in favor of broad coverage of individuals . . . ." 42 U.S.C. 12102(4)(A). Similarly, "substantially limits" must be "interpreted consistently with the findings and purposes of the [ADAA]," and an impairment need substantially limit only one major life activity to qualify as a disability. *Id.* § 12102(4)(B), (C). The amended regulations provide that "substantially limits" is "not meant to be a demanding standard," 29 C.F.R. § 1630.2(j)(1)(i), and shall be construed "to require a degree of functional limitation that is lower than the standard" that predated the ADAA, *id.* § 1630.2(j)(1)(iv). Similarly, "major life activity" must neither be read to "create a demanding standard" nor be defined "by reference to whether it is of 'central importance to daily life.'" *Id.* § 1630.2(i)(2).[18]

---

[17] The District overstates *Thornton*'s holding. In that case, the Ninth Circuit held only that the "inability to *continuously* keyboard or write" did not constitute a disability. *Thornton*, 292 F.3d at 1046 (emphasis added).

[18] The ADAA took effect on January 1, 2009, *see* ADAA, Pub. L. No. 110–325, § 8, 122 Stat. 3553, 3559 (2008), and the statute does not have retroactive effect, *see Lytes v. D.C. Water*

In light of the ADAA's broad definition of "disability," the Court concludes that the District has failed to demonstrate that Martin lacked a "disability" as a matter of law. *Celotex*, 477 U.S. at 323.[19]   Martin has produced a December 2008 letter from her doctor advising her against typing for three months.   *See* Dr. Mody letter, Pl.'s Ex. 59.   Her problems did not subside after three months; in 2010, Martin inquired on several occasions about the availability of voice recognition software.   Martin correspondence, Pl.'s Ex. 64.   In September 2011, after Martin had undergone surgery and occupational therapy, her doctor instructed her to limit working hours to four hours per day and computer usage to one hour per day; to avoid grasping, pushing, and pulling; and to observe weight limits for lifting and time limits for standing, walking, sitting, and driving.   *See* Dr. Mosely recommendations, Pl.'s Ex. 65.

---

*& Sewer Auth.*, 572 F.3d 936, 939–42 (D.C. Cir. 2009).  But the ADAA's lack of retroactive effect does not help the District as to Martin's disability discrimination claim, at least for summary judgment purposes.  Although Jackson initially decided in December 2008 to divert cases from Martin on account of her carpal tunnel syndrome, there is evidence to support a finding that her workload reduction persisted well into 2010.  *See* Martin Aff. ¶ 90, Pl.'s Ex. 74 ("I did not have enough work [in August 2010] to sustain me thru [sic] the 8 hour tour.").  Similarly, the lack of pre-2009 retroactivity does not bear on the failure-to-accommodate claim in Counts Five and Six: Martin worked for much of the period from 2009 through 2011, allegedly without the benefit of a reasonable accommodation, *see* Martin Aff. ¶¶ 29, 34, 84, Pl.'s Ex. 74, and the District did not provide the requested software until late 2011, *see* Martin Dep. 33:17–18, Defs.' Ex. Q.  The Court further notes that Martin does not challenge any non-selection or discrete act of discrimination that occurred during the period after her December 2, 2008, diagnosis and before the ADAA took effect on January 1, 2009.  *See, e.g.*, Martin Aff. ¶ 21, Pl.'s Ex. 74 (explaining that her removal from the Inaugural Committee occurred "prior to [her] being diagnosed"); Dr. Mody letter and emails of Dec. 3, 2008, Pl.'s Ex. 59.  While the Court need not decide today whether Martin's carpal tunnel syndrome constituted a "disability" before the ADAA took effect, it notes that this determination could bear upon the period of the District's potential violation, and thus the amount of damages, should the litigation progress.

[19] The District also cites *Strutynski v. Norton*, EEOC DOC 01980837, 2001 WL 1158631 (E.E.O.C. Sept. 26, 2001), but that agency decision also pre-dates the ADAA.  Moreover, *Strutynski* is distinguishable on its facts: In that case, the complainant was able to work "full-duty" so long as she took short breaks every few hours to stretch.  Thus, the EEOC concluded only that "*prolonged* typing" was not a major life activity.  *Id.* at *2 (emphasis added).

On this record, a jury could find that when Jackson decided to reduce her workload, Martin had a "physical . . . impairment that substantially limit[ed]" the major life activity of "working" insofar as her job required typing.  42 U.S.C. § 12102(1)(A), (2)(A).  A jury could also find that in 2011, her condition limited several other major life activities, including "manual tasks, . . . walking, standing, lifting, . . . , [and] communicating."  *Id.*  Based on these findings, a jury could conclude that Martin was an individual with a "disability," especially in light of the statutory instruction that "disability" should be interpreted "in favor of broad coverage of individuals."  *Id.* § 12102(4)(A).  The Court takes additional guidance from Congress's intent that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis," and that courts should instead focus on determining whether defendants "have complied with their obligations" under the ADA.  ADAA, Pub. L. No. 110-325, § 2(b)(5), 122 Stat. 3553, 3554 (2008).  Because there remains a dispute of material fact as to whether carpal tunnel syndrome is a "disability," the District is not entitled to summary judgment on Martin's disability-based discrimination claim in Count Five.[20]

---

[20] Prior to the ADAA's passage, many courts had found that carpal tunnel syndrome did not constitute a "disability" under the ADA.  *See Cutler v. Hamden Bd. of Educ.*, 150 F. Supp. 2d 356, 358–59 (D. Conn. 2001) (reviewing cases).  By contrast, courts that have considered carpal tunnel syndrome under the ADAA have regarded it as a disability.  *See Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 605–607 (E.D.N.Y. 2013) (rejecting defendant's argument in motion to dismiss that carpal tunnel syndrome did not cause plaintiff to be "regarded as" having a disability under 42 U.S.C. § 12102(1)(C)); *Featherston v. District of Columbia*, 908 F. Supp. 2d 153, 156 (D.D.C. 2012) (denying defendant's motion for summary judgment on ADA and Rehabilitation Act claims and explaining that dispute of fact existed as to whether plaintiff was harassed and retaliated against on the basis of her carpal tunnel syndrome disability); *Gibbs v. ADS Alliance Data Sys., Inc.*, No. 10-2421-JWL, 2011 WL 3205779, at *3 (D. Kan. July 28, 2011) (unpublished) ("After examining the evidence in the record . . . (certainly there is some evidence that plaintiff's condition affected her ability to perform manual tasks), and keeping in mind that this inquiry is not meant to be 'extensive' or demanding, the court concludes that genuine issues of material fact exist as to whether plaintiff's carpal tunnel syndrome constitutes a disability within the meaning of the ADA.").

*b.  Gender Discrimination under Title VII*

Martin asserts in Count One that her gender was also a basis for discrimination as to her "work assignments," in violation of Title VII.  *See* Am. Compl. ¶ 120.  Although the District moves generally for summary judgment on all disparate-treatment claims in Count One, *see* Mem. Supp. Mot. Dismiss & Summ. J. 9, it does not address the "work assignments" claim in its motion—neither offering a nondiscriminatory reason nor attacking Martin's prima facie case.[21]  Nonetheless, to proceed, Martin still must establish the elements of a prima facie case.  *See Brady*, 520 F.3d at 494 n.2.

A plaintiff asserting a Title VII gender-discrimination claim "makes out a prima facie case of disparate-treatment discrimination by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Czekalski*, 475 F.3d at 364 (internal quotation marks omitted).  The first prong is satisfied, as Martin is a female protected by Title VII.  The second prong would not bar Martin's claim either: Her evidence establishes that the reduction in her workload was substantial and lasted into 2010.  *See* Martin Aff. ¶ 90, Pl.'s Ex. 74; *cf. Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (holding that "precipitous reduction in the complexity of [plaintiff's] work and the substantial amount of time it took to correct these deficiencies" constituted adverse employment action as to Title VII retaliation claim).

---

[21] In fairness to the District, the Court recognizes that the phrase "work assignments" could be construed as referring not to Martin's decreased workload, but rather to various denied volunteer positions—which the District does address.  *See infra* Part IV.B.5.  While the amended complaint is not a model of precision, it consistently uses the term "volunteer opportunities" in reference to the specific positions of Inaugural Liaison and Training, Fleet, and Special Events Coordinators.  *See* Am. Compl. ¶¶ 26–30.  Moreover, the amended complaint contains separate factual allegations under the heading "Reduction in Work."  *See id.* ¶¶ 48–53.  Accordingly, the Court concludes that Martin's "work assignments"-based gender discrimination claim is distinct enough to stand alone.

The third prong of the Title VII disparate-treatment prima facie case is that "the unfavorable action gives rise to an inference of discrimination," *Czekalski*, 475 F.3d at 364, which inference a plaintiff can establish by eliminating "the two most common legitimate reasons . . . to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought," *Stella*, 284 F.3d at 145.  Here, Martin's evidence could support a finding that she was still qualified to handle her normal workload, despite her inability to type for three months.  *See* Dr. Mody letter, Pl.'s Ex. 59 (advising against keyboard use for three months); Jackson memo, *id.* ("[W]here [Martin] is working with another ABRA investigator and they observe a violation, the other investigator is to take the lead and prepare the report.").[22] Furthermore, there was no absence of a job "vacancy," since Martin's cases were simply reassigned to her colleague.  *See* Nickens Aff. ¶ 6, Pl.'s Ex. 58.[23]

Because Martin's evidence rules out "the two most common legitimate reasons" for reducing her workload, she has made out a prima facie case for her claim that the reduction was based on her gender.

*       *       *

---

[22] On the other hand, Martin's evidence arguably shows that she lacked "qualifications" for taking on new assignments given that carpal tunnel syndrome had significantly impaired her ability to type.  *Id.*; *see also* Dr. Mody Letter, Pl.'s Ex. 59; Nickens Aff. ¶ 6, Pl.'s Ex. 58. Indeed, this impairment is the basis of her disparate-treatment and failure-to-accommodate claims *under the ADA*.  But the District has not contested Martin's qualifications, and the Court concludes that there is at least a genuine dispute of fact.

[23] The job "vacancy" formulation of *Stella* corresponds to a discrimination claim based on a rejected job application, but the D.C. Circuit applies the same reasoning in analyzing the prima facie case for other adverse actions not dealing strictly with a rejected application.  For example, where the plaintiff "was removed" from a position or other opportunity, courts ask whether "either someone else filled the position or the employer sought other applicants." *Brady*, 520 F.3d at 493 n.1 (reviewing varying formulations of the prima facie case).  Here, Martin's "removal" from her cases and her replacement by her colleague would satisfy this formulation of the prima facie case.

Accordingly, the Court dismisses all claims in Count Five as to defendants Moosally, Jackson, Stewart, and Delaney.  The Court denies summary judgment on Counts One and Five as to Martin's claim against the District that, on account of her gender and disability, respectively, she suffered the disparate treatment of a reduced workload.

### 3.  Denial of Promotion to Supervisory Investigator

Martin alleges that she was denied a promotion to Supervisory Investigator on the basis of her gender, disability, and age.  *See* Am. Compl. ¶¶ 15–23, 119–23, 139–45, 197–200.  In response, the District proffers a nondiscriminatory reason for the denial: ABRA was advised by the DCHR that Martin was ineligible for the promotion under the "time-in-grade" rule because she had occupied her current position for less than one year.  Mem. Supp. Mot. Dismiss & Summ. J. 10 (citing Jackson Aff. ¶ 3, Defs.' Ex. I).  As evidence of the DCHR's guidance, the District cites a Selection Certificate listing three individuals deemed eligible for the promotion— not including Martin.  *See id.* at 10–11 (citing Selection Certificate, Defs.' Ex. J).

In arguing that the District's reason was pretextual, Martin does *not* contend that she was eligible for promotion under the time-in-grade rule.  Indeed, she effectively concedes that she did not have one year's time in grade.  *See* Pl.'s Am. Statement of Facts ¶ 38 (stating that interviewee "also" had less than one year's time in grade).  Nor does she challenge the facial validity of the time-in-grade rule or its applicability to her.  Rather, Martin submits that a jury could find the District's reason to be pretextual on the basis of evidence that ABRA management interviewed, extended offers to, and ultimately promoted Investigators who *also* failed to satisfy the time-in-grade rule.  The Court agrees with Martin: Based on this record, a jury could conclude that ABRA did not "honestly and reasonably believ[e]" that its time-in-grade rule was a valid basis for refusing to consider Martin.  *Brady*, 520 F.3d at 496 (emphasis omitted); *id.* at

495 n.3 (explaining that finding that proffered reason was "not the actual reason" can be established by showing "inconsistencies in the stated reasons for the adverse action").

When an employer cites a facially nondiscriminatory policy as a reason for an adverse employment action, the plaintiff can undermine that reason by showing that the policy is waived or applied more leniently to a similarly situated employee.  In *Mungin v. Katten Muchin & Zavis*, Mungin, an attorney hired laterally by the Katten law firm, alleged that because of his race, his starting salary was lower than that of other sixth-year associates.  116 F.3d 1549, 1554 (D.C. Cir. 1997).  Katten's nondiscriminatory reason was that under the firm's policy, all lateral hires were paid less—in an amount between the associate's former salary and the salary of current Katten associates.  *Id.*  On appeal, Mungin contended that the firm's reason was pretextual because it "never demonstrated that such a policy was ever consistently and systematically enforced," citing the higher salaries of white sixth-year associates.  *Id.*  But the D.C. Circuit disagreed, explaining that Mungin had compared his pay only to that of "homegrown" associates and had failed to identify any "nearly identical" lateral hires "to whom this policy was not enforced."  *Id.* (citations and internal quotation marks omitted).[24]

Unlike Mungin, Martin has identified "nearly identical" colleagues who were treated more favorably in spite of the time-in-grade rule.  *Id.* at 1554.  Martin's evidence suggests that three colleagues—Price, Matthews, and Stewart—were, like her, ineligible under the time-in-

---

[24] *See also McDonnell Douglas*, 411 U.S. at 804 (explaining that in context of pretext analysis, an employer "may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races"); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (rejecting plaintiff's pretext argument because the colleague who she alleged was treated more favorably was not "similarly situated" to plaintiff, given that the colleague had no major problems relating to co-workers, was lower in seniority and thus more removed from the partnership decision, and was critiqued in performance evaluations for "less serious" shortcomings).

grade rule at the time they sought promotions to Supervisory Investigator.[25]  Yet unlike her, they were interviewed and, in the case of Stewart and Price, actually promoted.[26]  This inconsistency suggests that even if the time-in-grade rule was formally in effect, it was not "consistently and systematically enforced."  *Id.*

The inquiry cannot end here, however, because as the District correctly notes, a plaintiff must do more than show the employer's nondiscriminatory reason to be "false": She must demonstrate that the employer's action is not "justified by a *reasonable belief in the validity* of the reason given . . . ."  *George*, 407 F.3d at 415 (emphasis added).  Indeed, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."  *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (citation omitted).  The District claims that ABRA management reasonably relied on the DCHR's Selection Certificate, even if the Certificate was inaccurate.  *See* Mem. Supp. Mot. Dismiss & Summ. J. 10–11 ("DCHR, not ABRA, selected the candidates who were qualified for the position and should be interviewed.").

---

[25] Price, who was interviewed and ultimately promoted in November 2008, began working at ABRA in February 2008.  *See* Price appointment form, Pl.'s Ex. 31; Jackson email of Nov. 7, 2008, Pl.'s Ex. 41 (promotion announcement).  Matthews, who had less than one year of experience in grade, was at least offered an interview, whereas Martin was not.  *See* Jackson email of May 21, 2008, Pl.'s Ex. 32 (Matthews promotion in May 2008); Interview notes, Pl.'s Ex. 39 (notes for "J.M.").  Stewart did not satisfy the time-in-grade rule when he was, according to Martin's affidavit, offered the Supervisory Investigator promotion in late 2008.  *See* Martin Aff. ¶ 27, Pl.'s Ex. 74.  Nor did Stewart comply with the rule when he was ultimately promoted to Supervisory Investigator in November 2009 since he had just re-joined ABRA in April 2009.  *See* Moosally email of Nov. 10, 2009, Pl.'s Ex. 53 (announcing promotions); Moosally email of Apr. 10, 2009, Pl.'s Ex. 47 (announcing Stewart's return to ABRA).  Even if Stewart's time-in-grade from before his departure counted toward his ultimate time-in-grade calculation, he would still not have satisfied the rule.  Martin Aff. ¶ 27, Pl.'s Ex. 74 (stating that Stewart had less than three months' time in grade just prior to his departure in late 2008).

[26] Matthews, too, was eventually promoted alongside Stewart in November 2009.  *See* Moosally email of Nov. 10, 2009, Pl.'s Ex. 53.  Although it is possible that by that time, he had satisfied the time-in-grade requirement, Martin's evidence suggests that ABRA management interviewed Matthews in October 2008, when he lacked the requisite time in grade.

The Certificate purports to identify three individuals eligible for the promotion, and Martin was not among them. *See* Selection Certificate, Defs.' Ex. J.

However, the Court concludes that the Selection Certificate is unavailing and, in fact, bolsters Martin's argument that the time-in-grade rule was "not the actual reason" for ABRA's action. *Brady*, 520 F.3d at 494. In short, Martin has introduced evidence sufficient for a jury to conclude that the Selection Certificate is not the binding guidance the District makes it out to be. First, Martin's evidence suggests that on at least one past occasion, ABRA management attempted to fill a vacancy by first identifying the candidate it wished to hire, and then asking the DCHR to place that candidate's name on a Selection Certificate. *See* Farouk email of Feb. 15, 2008, Pl.'s Ex. 30. This procedure suggests that the Selection Certificate is a mere formality, that ABRA management—not DCHR—decides which employees to promote, and that the notion of "eligibility" is subject to manipulation. Second, although the Selection Certificate here appears to bear a list of eligible employees, the Certificate was dated October 31, 2008, and Martin has produced interview notes dating from October 24, 2008. *See* Selection Certificate, Defs.' Ex. J; Interview notes, Pl.'s Ex. 39. The fact that interviews took place before the Selection Certificate's issuance further supports an inference that ABRA management was not bound by names listed therein.[27]

Moreover, the Certificate, viewed in the light most favorable to Martin, appears to contravene the District's own policies for waiver of the time-in-grade rule, further suggesting that the rule was not consistently enforced. Under District Personnel Manual Instruction No. 8-59, each job candidate appearing on a Selection Certificate who is ineligible under the time-in-

---

[27] In addition to Price and Matthews, the Selection Certificate also listed a third individual as eligible—David Bailey. *See* Selection Certificate, Defs.' Ex. J. Bailey, too, was interviewed before the Certificate was generated. *See* Interview notes, Pl.'s Ex. 39.

grade rule must be marked with an asterisk, accompanied by an explanation of time-in-grade

waiver procedures.  *See* DPM Instruction No. 8-59 § 6(c), D.C. Department of Human

Resources, http://dchr.dc.gov/publication/issuance-i-8-59 (last visited Jan. 15, 2015).[28]  Both

Matthews and Price are listed on the Certificate, and if both men were ineligible under the time-

in-grade rule (as Martin's evidence suggests), then asterisks should have appeared by their names

with the relevant explanation.  *See* Selection Certificate, Defs.' Ex. J.  There are no such

asterisks or explanations, and the Court concludes that this absence could further suggest that the

time-in-grade rule was not rigorously or consistently enforced.  Thus, Martin has proffered

sufficient evidence that could support a jury finding that ABRA's action was not "justified by a

reasonable belief in the validity of the reason given."  *George*, 407 F.3d at 415.

 Having concluded that Martin's evidence could show that the District's

nondiscriminatory reason was "not the actual reason" for its action, the Court must now ask

whether the evidence could also show that "the employer intentionally discriminated against the

employee" on the unlawful basis.  *Brady*, 520 F.3d at 494.  Accordingly, the Court reviews

---

[28] Martin produced emails referring to DPM Instruction No. 8-59, but the Instruction itself is not attached as an exhibit.  *See* Pendarvis email of Nov. 17, 2008, Pl.'s Ex. 42, ECF No. 128-42.  Nonetheless, "[c]ourts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies."  *Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, No. 13-cv-1501, 2014 WL 2171089, at *3 (D.D.C. May 23, 2014).  The Court notes that Martin's explanation of the Instruction in her opposition misses the mark: She claims that the Instruction "provide[d] more flexibility" for the enforcement of the time-in-grade rule.  *See* Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 4 (quoting Pendarvis email of Nov. 17, 2008, Pl.'s Ex. 42).  But "flexibility" in a policy (*i.e.*, the allowance of exceptions or waivers under certain conditions) would not alone render any reliance on that policy pretextual.  After all, one could imagine a situation in which selected candidates properly qualified for a time-in-grade waiver and were granted it, whereas the plaintiff did not obtain the benefit of the waiver and was rejected for not complying with the rule.  But here, no waivers were applied, so the time-in-grade rule's flexibility is irrelevant.  Rather, what creates a dispute of fact about pretext—about whether ABRA's reliance on the rule was "reasonable in light of the evidence," *Brady*, 520 F.3d at 495—is Martin's evidence of the District's *inconsistent* application of the time-in-grade rule.

holistically Martin's evidence of discrimination supporting her claims of disparate treatment based on gender, disability, and age.  *See Evans*, 754 F. Supp. 2d at 44 (examining evidence for pretext, prima facie case, and any "further evidence of discrimination").

### a.  Gender Discrimination under Title VII

Martin's evidence could support a jury finding that ABRA "intentionally discriminated" against her on the basis of her gender.  *Brady*, 520 F.3d at 494.  In addition to Martin's evidence supporting a prima facie case,[29] she has introduced "further evidence of discrimination."  *See Evans*, 754 F. Supp. 2d at 44.

As to the evidence of a prima facie case, the District does not dispute that Martin is a member of a protected class and that the denial of the promotion was an adverse employment action.  Likewise, a jury could draw an inference of discrimination because Martin's evidence does not establish either her "absolute or relative lack of qualifications or the absence of a vacancy in the job sought."  *See Stella*, 284 F.3d at 145.  The Supervisory Investigator position was vacant when Martin applied in 2008, and the District's only claim that Martin lacked "qualifications"—that she was ineligible under the time-in-grade rule—has not stood up to Martin's evidence that this explanation was not the "actual reason" for ABRA's decision.  *Brady*, 520 F.3d at 494; *id.* at 496 n.4 ("[D]iscrediting an employer's asserted reason is often quite probative of discrimination." (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000))).

There is also indirect evidence of discriminatory animus in the form of later statements made by Jackson.  In August 2009, Jackson told Martin's colleague that he should be "ashamed .

---

[29] Under *Brady*, this Court shall not ask whether Martin has actually established her prima facie case, given that the District proffered a nondiscriminatory reason for its action.  *See Pederson*, 636 F. Supp. 2d at 82 n.2.

. . for being co-dependent on a '[w]oman'"—Martin.  Nickens Aff. ¶ 8, Pl.'s Ex. 58.  Moreover,

in October 2009, Jackson stated that he was hiring "four . . . new male [I]nvestigators" to

"'balance' out the 'mess' in the office."  *Id.* ¶ 10; *see also* Martin Aff. ¶ 46, Pl.'s Ex. 74 ("Chief

Jackson added that they were older males, so that they could balance out the office.").

Considering the "totality of the circumstances of the case," the Court concludes that the District

is not entitled to summary judgment on Martin's gender discrimination claim as to her denial of

the promotion to Supervisory Investigator.  *Evans*, 754 F. Supp. 2d at 44 (citing *Reeves*, 530 U.S.

at 147).

### b.  Disability Discrimination under the ADA

Martin has not shown that ABRA "intentionally discriminated against [her] on the basis

of [her disability]" by denying her the promotion, *Brady*, 520 F.3d at 494, because she has not

proffered evidence that she had a "disability" at the time of the denial, 42 U.S.C. § 12112(a);

*Swanks*, 179 F.3d at 934.  Martin was allegedly denied the promotion in October 2008, when

ABRA officials allegedly declined to invite her to interview.  *See* Jackson email of Oct. 27,

2008, Pl.'s Ex. 40; Martin Aff. ¶ 16, Pl.'s Ex. 74 (explaining that on October 1, 2008, Martin

learned from Jackson and Delaney that she was ineligible for the promotion).  But not until

November 7, 2008, did she experience the initial numbness in her hand that prompted her later

doctor's visit and carpal tunnel syndrome diagnosis in December 2008.  *See* Martin Aff. ¶ 20,

Pl.'s Ex. 74; Mody letter, Pl.'s Ex. 59.  Thus, the District is entitled to summary judgment on

Martin's claim of disability discrimination as to the denied promotion.

### c.  Age Discrimination under the ADEA

An ADEA plaintiff must establish as part of her prima facie case that she was

"disadvantaged in favor of a younger person."  *Teneyck*, 365 F.3d at 1155.  An inference of

discrimination cannot be drawn from the fact that a plaintiff lost out to another individual who was "insignificantly younger." *O'Connor*, 517 U.S. at 313. Martin has neither alleged that Price is younger than she is nor proffered any evidence of his age.[30] Accordingly, the Court concludes that the District is entitled to summary judgment on Martin's claim of age discrimination as to the denied promotion.

* * *

The Court grants the motion for summary judgment on Counts Five and Ten as to Martin's claims that she was denied the promotion to Supervisory Investigator on the basis of her disability and age, respectively. The Court denies the motion for summary judgment on Count One as to the claim that this denial was based on gender.[31]

---

[30] The record shows that Matthews and Stewart, who were later promoted in November 2009, were about five or six years younger than Martin. *See* DCOHR letter 3, Defs.' Ex. E. While the evidence of their promotion serves to undermine the District's nondiscriminatory reason, their ages are not relevant to the Court's analysis here, since they were not promoted in the fall of 2008—and Martin challenges only this denial. *See infra* note 31. Even if the Court were to consider their ages, it would conclude that a five- or six-year differential is not significant enough, on this record, to support a prima facie case of age discrimination. *See infra* Part IV.B.4.c (analyzing age differential between Martin and Stewart as to denial of Relief Supervisory Investigator appointment).

[31] The amended complaint alleges only that Martin "submitted an application for *one of* the [Supervisory Investigator] positions" and was "never contacted or interviewed for *the position*." Am. Compl. ¶ 23 (emphases added). Although Martin's opposition contains certain allegations about her purported application for the second vacant Supervisory Investigator position in 2009, Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 5–6, "a party may not amend its complaint or broaden its claims through summary judgment briefing," *District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263 (D.D.C. 2010). Even assuming *arguendo* that the amended complaint could be construed as alleging that the second denial was discriminatory, the Court concludes that Martin has failed to show that the District's nondiscriminatory reason—that she failed to apply for the position—is pretextual. *See* Reply Supp. Defs.' Mot. Dismiss & Summ. J. 4; Pl.'s Am. Statement of Facts ¶ 46 ("Plaintiff did not submit a new application in relation to the reposting of the SI positions."). Martin has produced an automatically generated confirmation indicating that in February 2009, she submitted a resume for an "Investigator" position, but this evidence does not create a dispute of fact as to her failure to apply for the second Supervisory Investigator position. *See* Confirmation, Pl.'s Ex. 45, ECF No. 128-45.

### 4.  Denial of Relief Supervisory Investigator Assignment

Martin alleges that she was denied the opportunity in June 2009 to serve as a Relief

Supervisory Investigator on the basis of her gender, disability, and age.  *See* Am. Compl. ¶¶ 24–

25, 119–23, 139–45, 197–200.  The District fails to assert any nondiscriminatory reason for

Martin's loss of this opportunity.[32]  Because the District offers no nondiscriminatory reason, the

Court must determine whether Martin has made out a prima facie case.  *See Brady*, 520 F.3d at

494 n.2.

#### a.  Gender Discrimination under Title VII

As explained above, a Title VII plaintiff "makes out a prima facie case of disparate-

treatment discrimination by establishing that: (1) she is a member of a protected class; (2) she

suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference

of discrimination."  *Czekalski*, 475 F.3d at 364 (citation and internal quotation marks omitted).

The first prong is easily satisfied, as Martin is a female protected under Title VII.  Likewise, the

third prong is no obstacle: A jury could draw an "inference of discrimination" because the record

---

[32] The District contends that after Jackson offered Martin an opportunity to serve as Relief Supervisory Investigator, Martin declined on the grounds that she refused to answer service calls after hours, as required by the position.  But the District cites Jackson's affidavit, which discusses only the *August 2009* denial, not the June 2009 denial challenged by Martin. *See* Mem. Supp. Mot. Dismiss & Summ. J. 11 (citing Jackson Aff. ¶ 5, Defs.' Ex. I).  The District also cites Hollis's affidavit, which lacks temporal specificity:

> No I am not aware that the Complainant [Martin] was denied the opportunity to volunteer for any of these positions [including that of Relief Supervisory Investigator].  The Complainant did volunteer for the relief supervisor [sic] but stated that she did not desire the responsibility of carrying the ABRA Hotline Phone and answering it on a 24 hours basis [sic] when she is off duty.

Hollis Aff. ¶ 10, Defs.' Ex. L, ECF No. 118-15.  Because the Court is obligated to draw all inferences in Martin's favor, the Court concludes that Hollis's affidavit, like Jackson's, refers only to Martin's August 2009 attempt to serve as Relief Supervisory Investigator.  The Court need not decide whether the District's reason for the August 2009 denial is pretextual, since Martin challenges only the June 2009 denial.  *See* Am. Compl. ¶¶ 24–25.

rules out "the two most common legitimate reasons" for denying an opportunity—"absolute or relative lack of qualifications or the absence of a vacancy . . . ." *Stella*, 284 F.3d at 145 (citation omitted). The District's own evidence establishes that all Investigators were qualified to serve as Relief Supervisory Investigator, and the District does not deny that Martin was presented with such an opportunity in June 2009. Jackson Aff. ¶ 5, Defs.' Ex. I.[33]

The remaining question for Martin's prima facie case is whether the June 2009 denial of an opportunity to serve as Relief Supervisory Investigator constitutes an "adverse employment action." Such an action must result in "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009); *see also* 42 U.S.C. § 2000e–2(a)(1). Certain decisions are "conclusively presumed to be adverse employment actions" because they directly impact employment status—hiring, firing, failing to promote, and reassignment with significantly different responsibilities. *Id.* at 552–53. By contrast, when a plaintiff challenges an employment action "that do[es] not obviously result in a significant change in employment status . . . [she] must go the further step of demonstrating how the decision nonetheless caused . . . an objectively tangible harm." *Id.* at 553. To inflict objectively tangible harm, the "denial of a training opportunity" must cause a "material change in [one's] employment conditions, status or benefits." *Casey v. Mabus*, 878 F. Supp. 2d 175, 184 (D.D.C. 2012) (quoting *Lester v. Natsios*,

---

[33] There is potentially a question of whether, on account of her disability, Martin was in fact qualified to serve as Relief Supervisory Investigator. *See supra* note 22. There is no record evidence explaining a Relief Supervisory Investigator's job duties. However, Jackson asked Martin and others by email if they were "interested in serving" in the position. Martin-Jackson emails of June 10, 2009, Pl.'s Ex. 48. This solicitation gives rise to a "justifiable inferenc[e] . . . drawn in [Martin's] favor" that she was indeed qualified and has therefore satisfied this element of her prima facie case. *See Anderson*, 477 U.S. at 255.

290 F. Supp. 2d 11, 29 (D.D.C. 2003)).  Actionable harm resulting from lost training can consist of "a failure to promote or a loss of career advancement opportunities."  *Trachtenberg v. Dep't of Educ. of City of New York*, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013) (citations omitted).  Put differently, denial of training that is a "stepping-stone" for advancement is an adverse employment action.  *Cruz v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 13-cv-1335, 2014 WL 2547541, at *5 (S.D.N.Y. June 4, 2014).

The Court concludes that Martin's evidence is sufficient to support a finding of "objectively tangible harm" because it suggests that the volunteer Relief Supervisory Investigator position was a "stepping-stone" for promotion to Supervisory Investigator, *see Cruz*, 2014 WL 2547541, at *5, and that she had thus been denied tangible "career advancement opportunities," *Trachtenberg*, 937 F. Supp. 2d at 468.  The crux of this inquiry is the materiality of the management training afforded by service as Relief Supervisory Investigator.[34]  Martin asserts that Matthews and Stewart, who were promoted to Supervisory Investigator, both "served in volunteer positions with similar duties . . . ."  Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 9.  Martin contends that a jury could find that the loss of these volunteer opportunities "harmed her future employment opportunities and competitive promotional opportunities within [ABRA]."  *Id.*

Martin's inferences find support in her proffered evidence.  First, the career paths of the three individuals promoted to Supervisory Investigator all included a period of service as Relief Supervisory Investigator.  Stewart and Matthews, both promoted in November 2009, had both previously served as Relief Supervisory Investigator, as did Price, who was promoted in

---

[34] The District does not discount the management training offered by the Relief Supervisory Investigator position.  *See* Jackson Aff. ¶ 5, Defs.' Ex. I (describing role as "special management assignmen[t]").

November 2008.[35]  *Cf. Casey*, 878 F. Supp. 2d at 184 (dismissing denial-of-training claim on basis that plaintiff's contention that training would have "increased her potential for career advancement" was "pure speculation").

Second, record evidence suggests that the position of Relief Supervisory Investigator was seen as a form of career advancement itself.  An individual who was removed in 2007 from his service as Acting Supervisory Investigator protested the action as a "demotion."  *See* Coward email of Dec. 7, 2007, Pl.'s Ex. 29, ECF No. 128-29.  Jackson himself, in a 2008 email soliciting volunteers for the position, asked Investigators to respond "if [they] would like to be considered to participate *in the management program* as a Relief Supervisor or Acting Supervisory Investigator."  Jackson email of Sept. 10, 2008, Defs.' Ex. K, ECF No. 118-14 (emphasis added).  In short, the evidence could lead a jury to conclude that the Relief Supervisory Investigator position, while in name a volunteer post, was in fact an informal promotion and change in "status" that carried significant weight when formal promotion decisions were made.  *Casey*, 878 F. Supp. 2d at 184; *cf. Yee v. Dep't of Envtl. Servs., Multnomah Cnty.*, 826 F.2d 877, 882 (9th Cir. 1987) (rejecting district court's finding of lack of pretext on basis of evidence that Title VII plaintiff's Caucasian colleague "was given preferential treatment in access to training opportunities and in de facto promotion to supervisory responsibilities before the vacancy in the supervisor position").

---

[35] *See* Jackson email of Oct. 8, 2008, Pl.'s Ex. 37 (Stewart in October 2008); Jackson email of June 11, 2009, Pl.'s Ex. 49 (Stewart in June 2009); Martin Aff. ¶ 5, Pl.'s Ex. 74 (Matthews in July 2008); Moosally email of Nov. 10, 2009, Pl.'s Ex. 53 (announcing promotions).  On two occasions prior to his promotion, Matthews also served as Acting Chief of Enforcement in Jackson's stead, but Martin does not challenge her non-selection for this position.  *See* Martin Aff. ¶¶ 13, 26, Pl.'s Ex. 74.  Price served once as Relief Supervisory Investigator.  *See* Martin Aff. ¶ 18, Pl.'s Ex. 74 (October 2008); Jackson email of Nov. 7, 2008, Pl.'s Ex. 41 (announcing promotion).

The Court is mindful of the imperative to avoid "judicial micromanagement of . . . employers' decisions about which of several qualified employees will work on a particular assignment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1197 (D.C. Cir. 2008) (citation and internal quotation marks omitted).  But here, Martin has produced evidence suggesting that the Relief Supervisory Investigator positions are more than ordinary assignments.  Rather, a jury could conclude that they are at least informal prerequisites for promotion or, at most, de facto promotions.  In denying such unique opportunities, ABRA must observe its obligations under Title VII, as it would in denying any other "conditions, status or benefits" of employment.  *See Casey*, 878 F. Supp. 2d at 184.

Because Martin has established a prima facie case of gender discrimination as to her denied opportunity to serve as Relief Supervisory Investigator, the District is not entitled to summary judgment on this claim.

### b.  Disability Discrimination under the ADA

To make out a prima facie case of discrimination under the ADA, Martin must show that "[she] had a disability within the meaning of the ADA, that [she] was 'qualified' for the position with or without a reasonable accommodation, and that [she] suffered an adverse employment action because of [her] disability."  *Swanks*, 179 F.3d at 934.  Martin's evidence could support findings that she had a disability, *see supra* Part IV.B.2.a, that she would have been qualified with or without a reasonable accommodation, *see supra* Part IV.B.2.b, and that the June 2009 denial of the Relief Supervisory Investigator opportunity constitutes an "adverse employment action," *see supra* Part IV.B.4.a.

Martin's prima facie case thus hinges on whether she lost out on the opportunity "because of [her] disability."  *Swanks*, 179 F.3d at 934.  Here, the only relevant evidence shows that

Martin was disabled in June 2009, and that Stewart was selected. *See* Jackson email of June 11,

2009, Pl.'s Ex. 49. The record is silent as to whether Stewart was disabled; indeed, Martin does

not advance an allegation one way or another. *See* Am. Compl. ¶ 25 (describing Stewart as "an

African American male under 40 years of age, with military and law enforcement background").

Although the Court must view factual disputes in the light most favorable to Martin, it cannot

assume facts in the absence of any evidentiary support. *See Celotex*, 477 U.S. at 324 (describing

nonmovant's duty to "designate specific facts showing that there is a genuine issue for trial").

To frame this analysis, the Court opts to proceed under the *arguendo* premise that

Stewart *was* disabled. The resultant inquiry implicates an open question in the D.C. Circuit: Is

evidence that the disabled plaintiff was rejected in favor of a non-disabled individual *necessary*

to demonstrate that the plaintiff suffered the rejection "because of [her] disability" for purposes

of her prima facie case? *Swanks*, 179 F.3d at 934.[36] Most courts of appeals have answered in

the negative—including the Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, and

Eleventh Circuits. *See* Craig Robert Senn, Minimal Relevance: Non-Disabled Replacement

Evidence in ADA Discrimination Cases, 66 Baylor L. Rev. 65, 82–88 (2014) (reviewing

---

[36] In requiring that the disabled plaintiff be rejected in favor of a non-disabled individual for ADA prima facie case purposes, another judge of this Court previously explained that "many other trial courts" had added this "fourth element" to the ADA prima facie case, and this decision was summarily affirmed on appeal in a four-sentence unpublished opinion. *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 654 (D.D.C. 1997), *aff'd sub nom. Kalekiristos v. C.T.F. Hotel Mgmt. Corp.*, 132 F.3d 1481 (D.C. Cir. 1997) (unpublished). First, the Court notes that in this Circuit, while unpublished summary affirmances have "some precedential value," they "should not strictly bind panels" of the court of appeals and are often not "suitable for governing future cases" given that they neither reach the merits nor benefit from oral argument. *In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011). Accordingly, this Court does not consider itself bound by the unpublished summary affirmance in *Kalekiristos*. Second, as explained above, the tides have changed in the last seventeen years. Now, the majority of the courts of appeals have held that selection of a non-disabled individual is not required to make out a prima facie case under the ADA. *See* Craig Robert Senn, Minimal Relevance: Non-Disabled Replacement Evidence in ADA Discrimination Cases, 66 Baylor L. Rev. 65, 82–88 (2014) (reviewing cases).

cases).[37]  Notably, in adopting this rule, the Seventh Circuit relied on the Supreme Court's

holding in *O'Connor* that under the ADEA, a plaintiff need not show that discrimination favored

an individual outside of the protected class in order to make out a prima facie case of age

discrimination.  *See Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 792–93 (7th Cir. 1997).

Following *O'Connor*'s rationale, the court explained that the selection of a non-disabled

individual "is not required to make out a prima facie case, so long as there is some evidence from

which one can infer that the employer took adverse action against the plaintiff on the basis of a

statutorily proscribed criterion."  *Id.* at 793 (explaining earlier parallel holding in Title VII

context).  The court went on to explain that "the nature of the proof giving rise to the requisite

inference of discrimination cannot be reduced to a formula that will serve any and all

discrimination cases."  *Id.*  "All that is necessary," reasoned the court, "is that there be evidence

reasonably suggesting that the employer would not have taken adverse action against the plaintiff

had she not been disabled and everything else had remained the same."  *Id.* at 794.

Because the D.C. Circuit has already applied the rationale of *O'Connor* in the Title VII

gender discrimination context, *see Stella*, 284 F.3d 145–46, this Court is persuaded that the D.C.

Circuit, like the Seventh Circuit in *Leffel*, would do the same under the ADA.  Accordingly, this

Court concludes that in establishing rejection "because of [her] disability" under the ADA at the

---

[37] The First and Fifth Circuits also arguably have not adopted such a requirement, given that they require only that a plaintiff "was replaced by a non-disabled person *or* was treated less favorably than non-disabled employees."  Senn, Minimal Relevance at 79 (citing *Ansel v. Tex. Water Dev. Bd.*, 464 F. App'x 395, 399 (5th Cir. 2012)).  However, in practice, the disjunctive construction is inconsequential, and cases often turn on whether a non-disabled individual was in fact selected.  *See id.* at 79–80.

A related question is whether evidence of non-disabled selection would be *sufficient* for showing that the adverse action resulted from the plaintiff's disability.  *See id.* at 88–93.  The Court need not address this question because it assumes that Stewart was disabled.  But posing the sufficiency question under the inverse assumption that Stewart was *not* disabled would yield the same result: Even if the Court were to hold that such evidence is *not* sufficient for a prima facie case, Martin's other evidence of discrimination would still enable her claim to proceed.

prima facie case stage, a plaintiff need not introduce evidence that a non-disabled individual was selected. *Swanks*, 179 F.3d at 934.

Applying the above principles, the Court finds that Martin has established a prima facie case of disability discrimination as to the denial of the Relief Supervisory Investigator opportunity. She has proffered evidence that she was disabled, and the (assumed) fact that Stewart was *also* disabled would not be fatal to her prima facie case because Martin has introduced "some evidence" of discriminatory hostility based on her disability. *Leffel*, 113 F.3d at 793. When Martin initially reported her condition to Jackson in December 2008, he accused her of having a pre-existing condition and of "dropping [her] injury in ABRA's lap." Martin Aff. ¶ 22, Pl.'s Ex. 74. Moreover, her evidence of discriminatory workload reduction shows that from at least January 2009 through August 2010, Jackson diverted cases away from her based on her inability to type. *See* Nickens Aff. ¶ 6, Pl.'s Ex. 58; Martin Aff. ¶ 90, Pl.'s Ex. 74. This evidence could support an inference that Martin was not selected for the Relief Supervisory Investigator position in June 2009 "because of [her] disability." *Swanks*, 179 F.3d at 934.

### c. Age Discrimination under the ADEA

An ADEA plaintiff must establish as part of her prima facie case that she was "disadvantaged in favor of a younger person." *Teneyck*, 365 F.3d at 1155. The D.C. Circuit has held that a plaintiff's replacement by an individual seven years younger, without other evidence that the plaintiff lost out "because of her age," is insufficient to make out a prima facie case at summary judgment. *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 767 (D.C. Cir. 2002); *accord Grosjean v. First Energy Corp.*, 349 F.3d 332, 338 (6th Cir. 2003).

Here, Martin has not established a prima facie case of age discrimination as to her loss of the Relief Supervisory Investigator position in June 2009. Her evidence establishes that in June

2009, Jackson chose Stewart to serve as Relief Supervisory Investigator. *See* Jackson email of June 11, 2009, Pl.'s Ex. 49. Stewart was only five or six years her junior: In November 2009, he was thirty-nine years old, *see* DCOHR letter 3, Defs.' Ex. E, while Martin was forty-five, *see* Defs.' Statement of Facts ¶ 2; Am. Compl. ¶ 2. If a seven-year age differential, standing alone, is insufficient to support a prima facie case, Martin's evidence must also fall short. *See Dunaway*, 310 F.3d at 767. Martin has proffered no other evidence demonstrating that she was disfavored "because of her age." *Id.* To the contrary, Martin's evidence suggests that "older" employees were preferred. Martin Aff. ¶ 46, Pl.'s Ex. 74 ("Chief Jackson added [in a September 2009 meeting] that [certain new hires] were *older* males, so that they could balance out the office." (emphasis added)).[38]

Because Martin's evidence does not show that Stewart was "significantly" younger than Martin, and because she has not otherwise suggested that she was not selected to be Relief Supervisory Investigator "because of" her age, her rejection cannot support a prima facie case of age discrimination under the ADEA. *See O'Connor*, 517 U.S. at 312–13.[39]

*   *   *

The Court grants the motion for summary judgment on Count Ten as to Martin's claim that she was denied the Relief Supervisory Investigator opportunity on the basis of her age. The

---

[38] The Court does not interpret the seven-year "rule" to be hard and fast. Indeed, the ADEA prohibits discrimination "because of . . . age," 29 U.S.C. § 623(a)(1), (2), without specifying a minimum age differential. There may be contexts involving jobs requiring so much physicality that a seven-year gap may be significant (professional athletes jump to mind). But there is nothing in this record suggesting that the five- or six-year gap in the context of Martin's job or workplace, standing alone, would raise any inference of age discrimination.

[39] While the other instances of Relief Supervisory Investigator appointments in 2008 and 2009 help establish the position's importance to career advancement (and thus are relevant to the "adverse employment action" inquiry), Martin challenges only the June 2009 appointment. Thus, the Court need only consider the age of Stewart, who was appointed in June 2009.

Court denies the motion for summary judgment on Counts One and Five as to Martin's claims that this denial was based on her gender and disability, respectively.

### 5.  Denial of Other Volunteer Opportunities

Martin alleges that ABRA denied her various other volunteer opportunities on the basis of her gender, disability, and age.  *See* Am. Compl. ¶¶ 27–30, 39–47, 119–23, 139–45, 197–200. Specifically, Martin claims that she was not allowed to serve as Inaugural Liaison for the 2009 Presidential Inauguration on the basis of her gender, as Training Coordinator and Special Events Coordinator on the basis of her age, and as Fleet Coordinator on the basis of both age and gender.  *See id.* ¶¶ 27–30.  The complaint further alleges that these denials of "volunteer opportunities" discriminated against her on the basis of her disability.  *See id.* ¶ 141.[40]  Martin also alleges that she was removed from ABRA's Inaugural Committee for the 2009 Presidential Inauguration on the basis of her gender, age, and disability.  *See id.* ¶¶ 39-47, 119–23, 139–45, 197–200.

The District contends that Martin has not made out a prima facie case, on the basis that the denials of these volunteer opportunities cannot constitute an "adverse employment action." *See Czekalski*, 475 F.3d at 364 (Title VII); *Swanks*, 179 F.3d at 934 (ADA); *Baloch*, 550 F.3d at

---

[40] A sixty-two-year-old male ("approximately twenty years older" than Martin) was selected to be the Fleet Coordinator, while females younger than Martin were selected for the Training and Special Events Coordinator positions.  *See* Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 30.  The Court notes alternative bases for granting summary judgment on the ADEA claims: There is no evidence that the females were significantly younger than Martin, *see Dunaway*, 310 F.3d at 767, and as for the Fleet Coordinator rejection, Martin cannot sustain a claim of age discrimination under the ADEA where the favored party is older, *see General Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 590–91 (2004).

1196 (ADEA).  In support, the District explains that the "volunteer activities did not result in extra pay or other tangible benefits."  Mem. Supp. Mot. Dismiss & Summ. J. 11.[41]

Here, the Court concludes that Martin has not introduced evidence that the denials of these other volunteer positions constitute adverse employment actions under Title VII, the ADA, or the ADEA.  To be sure, the District's evidence corroborates Martin's contention that these opportunities provided managerial and leadership training.  *See* Jackson Aff. ¶ 10, Defs.' Ex. I (explaining that Investigators could "gain experience with managing a program and developing leadership skills").[42]  But more is required: Martin's evidence must allow a jury to make a finding of "objectively tangible harm."  *Douglas*, 559 F.3d at 552.  In the context of denied training, such evidence must show that she suffered a "material change in [her] employment conditions, status or benefits," *Casey*, 878 F. Supp. 2d at 184, or "a failure to promote or a loss of career advancement opportunities," *Trachtenberg*, 937 F. Supp. 2d at 468.[43]

_____

[41] Notwithstanding the District's "initial responsibility" under Rule 56 of showing an "absence of a genuine issue of material fact" on this issue, the District fails to cite any legal authority or record evidence in support of its claim that the denial of volunteer activities cannot constitute adverse employment actions.  *Celotex*, 477 U.S. at 323.  The Court will nonetheless address the issue and excuse this deficient briefing.

[42] As for the Inaugural Committee from which she was removed, Martin does not even allege that service on the Committee constitutes "training."  *See* Martin Aff. ¶ 21, Pl.'s Ex. 74 (contending that the Inauguration was "historical").

[43] The District proffers a nondiscriminatory reason for removing Martin from the Inaugural Committee: Martin missed an appointment to have her photograph taken, and the photograph was a required credential for security reasons.  *See* Martin-Jackson emails of Nov. 19–20, 2008, Defs.' Ex. N; Mem. Supp. Mot. Dismiss & Summ. J. 12.  Because the District asserts a nondiscriminatory reason, the parties assume that the Court must decide *Brady*'s "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ?"  *Brady*, 520 F.3d at 494.  But *Brady* authorizes courts to ask the "one central question" only "where an employee has *suffered an adverse employment action* and an employer has asserted a legitimate, non-discriminatory reason for the decision . . . ."  *Id.* (emphasis added); *id.* at 493 (explaining that the "statutory text" of Title VII requires plaintiffs to establish an "adverse employment action").  Here, because

In contrast to Martin's evidence of the importance of the Relief Supervisory Investigator position, her evidence regarding the other volunteer opportunities fails to suggest any correlation to career advancement.  The fact that Price was the only future Supervisory Investigator to hold the position of Inaugural Liaison demonstrates that this experience was not required or particularly helpful for promotion.  *See* Jackson email of Sept. 11, 2008, Pl.'s Ex. 55 (selection of Shoemaker and Price as Inaugural Liaisons).  Similarly, none of the three promoted Investigators—Price, Matthews, or Stewart—was selected as Training, Special Events, or Fleet Coordinator.  *See* Pl.'s Am. Statement of Facts ¶ 53 (selection of Mitchell, Butler, and Corrales).  Lastly, although Price and Matthews served on the Inaugural Committee, Stewart did not, and several other Committee members were not promoted.  *See* Jackson email of June 21, 2008, Pl.'s Ex. 54.[44]  The attenuated relationship between Martin's non-selection for these volunteer positions and her alleged harm of stifled career advancement evokes *Douglas*, in which an agency's failure to nominate the plaintiff for an award ultimately conferred by the President was not an adverse employment action given the "inherent uncertainty" of a competitive selection process involving "multiple rounds of independent evaluation."  *Douglas*, 559 F.3d at 553.[45]

---

Martin's evidence does not establish an adverse employment action, the Court has no occasion to assess the District's proffered nondiscriminatory reason.

[44] Although promotion is certainly not the only possible "career advancement opportunit[y]," Martin's evidence does not suggest that other opportunities are relevant to this case. *Trachtenberg*, 937 F. Supp. 2d at 468.

[45] Martin correctly explains that, contrary to the District's motion, the loss of pay or benefits is not *required* for a finding of an adverse employment action. *See* Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 9 (citing *Czekalski*, 475 F.3d at 364 (holding that dispute of fact existed as to whether lateral transfer not resulting in loss of salary or benefits was nonetheless an adverse employment action due to loss of "supervisory duties" and reassignment with "significantly different responsibilities")).  Notwithstanding the District's misapprehension of the legal test, the Court concludes that there is no genuine dispute of material fact as to whether the loss of volunteer opportunities at issue here constituted adverse employment actions.

Because a jury could not find "objectively tangible harm" on this record, Martin has failed to raise a genuine dispute of material fact. *Douglas*, 559 F.3d at 552.

Accordingly, the Court grants the motion for summary judgment on Counts One, Five, and Ten, as to the denial of the other volunteer opportunities.[46]

### 6.  Denial of Overtime Pay

Martin alleges that around July 2009, she was not paid for an instance of overtime work on the basis of her gender. *See* Am. Compl. ¶¶ 36–37, 119–23.[47]  In response, the District asserts a nondiscriminatory reason for the denial: Martin failed to obtain written pre-approval for overtime work, in violation of ABRA procedures. *See* Mem. Supp. Mot. Dismiss & Summ. J. 11–12.  Martin contends that the District's reason is pretextual. *See Brady*, 520 F.3d at 494.  She

---

[46] The District proffers three other bases for granting summary judgment, but all are meritless.  The District first contends that "it is undisputed that Plaintiff was been [sic] selected for other subsequent volunteer positions."  Mem. Supp. Mot. Dismiss & Summ. J. 11 (citing Jackson Aff., Defs.' Ex. I).  The fact that Martin was selected on other occasions, however, does not establish a lack of a genuine dispute of material fact as to the alleged instances of disparate treatment. *Cf. Czekalski*, 475 F.3d at 368–69 (explaining that although female plaintiff's prior promotion could refute claim that employer had "general animus against female employees," it was not "alone sufficient" to support summary judgment on instant discrimination claim).  The District's two remaining attacks on Martin's prima facie case are that on the occasions when Martin was rejected, other women were selected, and that Martin "offers no evidence to show that the District [sic] failure to select her . . . had anything to do with her gender . . . ."  Mem. Supp. Mot. Dismiss & Summ. J. 11.  But Martin correctly explains that neither selection of a male nor direct evidence of discrimination is required to establish an "inference of discrimination" under the third prima facie case prong.  Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 31–32; *see also Czekalski*, 475 F.3d at 364.  Rather, a plaintiff's elimination of "the two most common legitimate reasons . . . to reject a job applicant"—"absolute or relative lack of qualifications or the absence of a vacancy in the job sought"—is "sufficient, absent other explanation, to create an inference that the decision was a discriminatory one."  *Stella*, 284 F.3d at 145 (quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 358 n.44).  Moreover, in *Stella*, the D.C. Circuit squarely held that "a plaintiff . . . need not demonstrate that she was replaced by a person outside her protected class" to establish a prima facie case. *Id.* at 146.

[47] Counts Five and Ten do not allege that Martin was denied overtime pay based on her disability or age, respectively.  *See* Am. Compl. ¶¶ 139–45, 197–200.

first submits that Relief Supervisory Investigator Matthews had previously approved her

overtime work.  Alternatively, she claims that Matthews's reason for the denial of overtime

pay—that too many people worked the same overtime shift—is inconsistent with the reason

given by the District in its motion.  Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 14.

 The Court concludes that Martin has not established a genuine dispute as to whether the

District's reason was pretextual.  First, Martin cites no record evidence supporting her assertion

that her overtime detail "was approved by [Acting Supervisory Investigator] Matthews" in

advance.  Pl.'s Statement of Facts ¶ 56.[48]  The Court also finds no inconsistency between

Matthews's statements and the District's assertion that Martin never obtained formal approval

for the overtime.  *See Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) ("[S]hifting and

inconsistent justifications are probative of pretext." (citation and internal quotation marks

omitted)).  According to Martin, Matthews, upon meeting other overtime workers during the

overtime shift, stated that "he was not paying overtime for . . . five people" and that one worker

had to leave.  Martin Aff. ¶ 37, Pl.'s Ex. 74.  Even when viewed in the light most favorable to

Martin, Matthews's remarks cannot be stretched to mean that Martin was properly approved for

the shift and would have received overtime pay *but for* there being too many people assigned to

the shift.  Such a statement would indeed suggest that the District's proffered reason was not the

"actual reason."  *Cf. supra* Part IV.B.3.a (District's invoking time-in-grade rule for rejecting

Martin is inconsistent with interviewing and hiring other candidates also ineligible under time-in-

grade rule).  Rather, Matthews's statement suggests only that an improper number of people

were present on the shift; his observation is fully consistent with the possibility that Martin failed

---

[48] Martin's Statement of Facts cites her affidavit, but her affidavit does not state that
Matthews gave her advance approval for the overtime shift; there, she claims only that she
"signed up to work overtime . . . ."  *See* Martin Aff. ¶ 37, Pl.'s Ex. 74).

to obtain approval for the shift, as the District asserts in its motion.  *Cf. Hairston v. Vance-Cooks*, 773 F.3d 266, 273 (D.C. Cir. 2014) ("Providing more detailed information once litigation begins does not create a genuine issue of material fact.").[49]

The Court grants the motion for summary judgment on Count One as to the denial of overtime pay.

### C.  Disparate Impact in Violation of Title VII (Count Two)

In Count Two, Martin alleges that ABRA's employment practices disparately impacted female employees as to promotion, training, volunteer opportunities, overtime pay, work assignments, and hiring.  *See* Am. Compl. ¶¶ 124–26.

"In certain cases, facially neutral employment practices that have significant adverse effects on protected groups have been held to violate [Title VII] without proof that the employer adopted those practices with a discriminatory intent."  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986–87 (1988) (emphasis omitted).  Plaintiffs seeking relief under this "disparate impact" theory must "offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."  *Id.* at 994.  That is, showing mere "imbalance" is insufficient; a plaintiff must demonstrate a causal link between the challenged employment practice and the resulting disparate impact.  *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S.

---

[49] Martin asserts in her affidavit that where too many individuals signed up for an overtime shift, "Chief Jackson had an elimination policy," under which the "person who works overtime the least will be allowed to work."  Martin Aff. ¶ 37, Pl.'s Ex. 74.  Martin fails to cite Jackson's policy in her opposition, but even if she had, it could not support a finding of pretext.  Because Martin's evidence does not establish that *Matthews* was aware of Jackson's policy when he denied her overtime pay or that the elimination policy was applied inconsistently in a similar context, and because she does not dispute her failure to obtain official approval, she fails to show that Matthews's view of the underlying facts was not "reasonable in light of the evidence."  *Brady*, 520 F.3d at 495.

642, 657 (1989) (emphasis omitted); *accord Garcia v. Johanns*, 444 F.3d 625, 635 (D.C. Cir.

2006) (applying Title VII disparate-impact analysis to Equal Credit Opportunity Act claim).

The District submits that Martin has failed to introduce statistical evidence demonstrating

causation, and the Court's review of the record confirms this to be so. *See* Mem. Supp. Mot.

Dismiss & Summ. J. 19. The amended complaint alleges that the gender composition of ABRA

Enforcement Division staff and new hires was skewed toward males. *See* Am. Compl. ¶¶ 63–66.

However, such allegations are insufficient—both because gender "imbalance" alone cannot

establish disparate impact liability, *Wards Cove Packing*, 490 U.S. at 657, and because mere

allegations without evidence cannot enable Martin to meet her summary judgment burden, *see*

*Celotex*, 477 U.S. at 324 (explaining that nonmovant must "go beyond the pleadings").

Accordingly, the Court grants summary judgment to the District on Count Two.[50]


**D.  Retaliation in Violation of Title VII and the D.C. Human Rights Act (Counts Three and Four)**

In Count Three, Martin alleges that the District retaliated against her for filing her

discrimination complaint and for participating in the investigation of the EEO complaint, in

violation of Title VII. *See* Am. Compl. ¶¶ 127–32. In Count Four, Martin alleges that all

Defendants retaliated against her for the same activities, in violation of the DCHRA. *See* Am.

---

[50] Because the Court concludes that Martin has failed to introduce the requisite statistical evidence, it declines to address the District's alternative argument that Martin has not proffered evidence of any facially neutral "employment practice" actionable under a disparate impact theory. Mem. Supp. Mot. Dismiss & Summ. J. 19. But the Court notes that Martin's vague and conclusory allegations do not seem to allege with any level of specificity the particular employment practices that result in the purported disparity; to the contrary, she suggests that ABRA lacked relevant policies altogether. *See* Am. Compl. ¶ 126 (alleging an "absence of appropriate personnel and administrative policies"); Pl.'s Am. Statement of Facts ¶ 69 (citing DCOIG report claiming the same).

Compl. ¶¶ 133–38.  The retaliation allegedly suffered by Martin includes the denial of

promotion, training, volunteer opportunities, overtime pay, reasonable accommodation, and work

assignments; unduly burdensome work assignments;[51] and verbal abuse and embarrassment.  *See*

*id.* ¶¶ 130, 137.[52]

Under Title VII, it is unlawful for an employer to discriminate against an employee

"because he has opposed any practice made an unlawful employment practice by this subchapter,

or because he has made a charge, . . . or participated in any manner in an investigation,

proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a).  "To prove retaliation

[under Title VII], the plaintiff generally must establish that he or she suffered (i) a materially

adverse action (ii) because he or she had brought or threatened to bring a discrimination claim."

*Baloch*, 550 F.3d at 1198.  Under Title VII, the elements of a prima facie case of retaliation are:

"first, that [the plaintiff] engaged in protected activity; second, that she was subjected to adverse

action by the employer; and third, that there existed a causal link between the adverse action and

the protected activity."  *Broderick v. Donaldson*, 437 F.3d 1226, 1231–32 (D.C. Cir. 2006)

---

[51] The Court recognizes a potential tension between Martin's allegations that she was denied work assignments and that she was given unduly burdensome work assignments. Nonetheless, the Court considers them separately, given that the denial of work allegedly pertains to Martin's normal caseload, whereas the burdensome assignments consist of work that Martin alleges should not have been hers to perform.  *See* Am. Compl. ¶¶ 101–105 (discussing burdensome training responsibilities); *id.* ¶¶ 137, 141, 202 (denial of "work assignments").

[52] The list of retaliatory actions alleged in Count Three (Title VII retaliation), Am. Compl. ¶ 130, differs from that in Count Four (DCHRA retaliation), *id.* ¶ 137.  To simplify its analysis, the Court will consider both Counts Three and Four with reference to *all* retaliatory actions alleged, regardless of whether they appear under Count Three or Count Four.

Additionally, the Court notes that the record is silent as to whether the EEOC issued a final decision on Martin's Title VII retaliation complaint, which was filed concurrently with her retaliation complaint before the DCOHR.  *See* Charges, Pl.'s Ex. 68.  Because the District does not argue that Martin failed to exhaust administrative remedies, the Court will assume that she did.  *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir.1997) ("Because untimely exhaustion of administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it.").

(citation omitted).  The materially adverse action must be such that it would "dissuad[e] a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation omitted).  Where a plaintiff allegedly suffers a materially adverse action, the defendant can prevail by offering "legitimate, nondiscriminatory reasons" for its action.  *Baloch*, 550 F.3d at 1200 (citing *Brady*, 520 F.3d at 494).

The DCHRA provides that "[i]t shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed . . . any right granted or protected" under the Act.  D.C. Code § 2–1402.61(a).  The elements of a prima facie case for a DCHRA retaliation claim are the same as those under Title VII.  *See Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 367–68 (D.C. 1993).[53]

Applying the above principles, the Court concludes that Martin has failed to introduce evidence that any act of alleged retaliation had a causal relationship to her protected complaints. The amended complaint alleges that Martin was saddled with the extra work of training Field Training Investigators ("FTIs") "on 72 separate occasions—in addition to [her] regular duties," and her evidence shows that she completed this work sometime between November 2009 and August 2010.  Am. Compl. ¶ 104; *see also* Martin Aff. ¶ 51, Pl.'s Ex. 74 (explaining that Martin learned of her non-selection as FTI in November 2009); *id.* ¶ 90 (explaining that Martin had

_____

[53] In *University of Texas Southwestern Medical Center v. Nassar*, the Supreme Court held that a plaintiff alleging Title VII retaliation "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  133 S. Ct. 2517, 2534 (2013); *accord Rattigan v. Holder*, 982 F. Supp. 2d 69, 82 (D.D.C. 2013) ("[Under] *Nassar*, it is now clear that a Title VII retaliation claim cannot rely on a mixed motive theory.").  There is no indication, however, that *Nassar*'s holding on the burden of *persuasion* has any impact on the prima facie case elements or the burdens of *production*.  *See supra* note 12 (discussing *Gross*, 557 U.S. at 175 n.2).

completed FTI training by August 2010).  Martin further alleges that ABRA management

fabricated complaints against her in June 2010 and August 2010 that impacted performance

reviews, denied her overtime pay in June 2010, and reduced her normal caseload from the time

of her carpal tunnel syndrome diagnosis through at least August 2010.  *See* Am. Compl. ¶ 72;

Martin Aff. ¶¶ 79–80, 90–91, Pl.'s Ex. 74.  Lastly, Martin alleges that she suffered "constant

verbal abuse, insults, personal attacks, and public embarrassment" because of her discrimination

complaints.  *See* Am. Compl.  ¶¶ 130.[54]  The record, however, is barren as to any evidence that

her discrimination complaints caused the alleged retaliation.  *Broderick*, 437 F.3d at 1231–32.

The remaining alleged materially adverse actions—loss of promotions, management

training, volunteer opportunities, reasonable accommodation, and work assignments—all took

place *before* Martin filed her discrimination claim in February 2010.  *See generally* Martin Aff.,

Pl's Ex. 74.  Indeed, those actions were the basis for her discrimination claim.  *See* Charges, Pl.'s

Ex. 68.[55]  Accordingly, Martin's evidence fails to create a dispute of fact about any causal

---

[54] Her affidavit mentions a few heated verbal exchanges and confrontations, but none are linked to the discrimination complaints.  *See* Martin Aff. ¶ 77, Pl.'s Ex. 74 ("[Mr. Stewart] called me yelling and badgering me about something unrelated to the car accident."); *id.* ¶ 79 ("[Mr. Stewart] wrote me up for discipline . . . for the Ziegfileds [sic] case."); *id.* ¶ 98 ("[Mr. Stewart] yell[ed], berate[d], and badger[ed] me in front of my coworkers.  Mr. Stewart was upset because I crafted a complaint form that the public could use if they wanted to lodge a complaint against an employee . . . .").  In any event, "sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims."  *Baloch*, 550 F.3d at 1199; *see also Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (explaining that Title VII does not create "a general civility code for the American workplace").

[55] ABRA's initial refusal to provide voice recognition software occurred in late 2008, well before Martin filed her discrimination claim in February 2010.  *See* Jackson memo, Pl.'s Ex. 60; Jackson memo, Pl.'s Ex. 59 (discussing request for software); *see also* Defs.' Statement of Facts ¶ 41.  Martin does not allege a factual basis for concluding that, after the filing of her discrimination claim, ABRA's ongoing failure to provide the requested software became retaliatory.  *Cf. Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("[P]roceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

connection between her protected activity and the alleged retaliation. *See Hayslett v. Perry*, 332 F. Supp. 2d 93, 98 (D.D.C. 2004) (holding that plaintiff cannot "establish a prima facie case of retaliation [as to] several of the alleged retaliatory acts [that] predate the relevant protected EEO activity").

The Court therefore grants summary judgment to the District on Count Three and to all Defendants on Count Four.[56]

---

Both parties read the amended complaint's Title VII and DCHRA retaliation claims as alleging retaliation not only for Martin's discrimination complaints, but also for her participation in the DCOIG special evaluation. *See* Defs.' Statement of Facts ¶¶ 7–9 (setting forth facts of DCOIG investigation as "related to" Martin's retaliation claims); Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 16 (claiming that DCOIG investigation participation was among Martin's "protected activities"); Reply Supp. Defs.' Mot. Dismiss & Summ. J. 6 (discussing DCOIG investigation as "protected activity"). But the amended complaint nowhere mentions the DCOIG investigation in connection with either the Title VII or DCHRA retaliation claims, *see* Am. Compl. ¶¶ 127–38, and "a party may not amend its complaint or broaden its claims through summary judgment briefing," *Barrie*, 741 F. Supp. 2d at 263. Even if Martin could amend Counts Three and Four, her claims would still fail because the DCOIG investigation concerned alleged official corruption, and there is no evidence that Martin opposed practices prohibited by Title VII or the DCHRA during that investigation. *See* 42 U.S.C. § 2000e–3(a); *Baloch*, 550 F.3d at 1198 ("To prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring *a discrimination claim*." (emphasis added)).

[56] Defendants further submit that Martin cannot assert her DCHRA retaliation claim in this Court, on the grounds that she elected to proceed before the DCOHR. Mem. Supp. Mot. Dismiss & Summ. J. 12–13. The DCHRA differs procedurally from Title VII in that the Act presents the complainant with a "mutually exclusive" choice between judicial and administrative forums. *See Anderson v. U.S. Safe Deposit Co.*, 552 A.2d 859, 860 (D.C. 1989). If a complainant has filed a complaint with the DCOHR, she cannot then sue in court, unless she first withdraws the complaint or unless the Office dismisses it "on the grounds of administrative convenience." D.C. Code § 2–1403.16(a). To be timely, a withdrawal must occur before the DCOHR completes its investigation and issues a decision on whether there is probable cause to believe that the employer behaved unlawfully. *See id.* § 2–1403.04(b); *see also Anderson*, 552 A.2d at 860–62; *accord Adams v. District of Columbia*, 793 F. Supp. 2d 392, 397 (D.D.C. 2011). Here, in March 2012, Martin filed a second retaliation complaint with the DCOHR alleging that she suffered isolation and demotion to an NTE ("not to exceed") employee. *See* Charge, Defs.' Ex. G. The DCOHR ultimately rendered a no-cause finding in May 2014. *See* DCOHR letter, Defs.' Ex. H. It thus appears that Martin's 2012 retaliation complaint was neither timely withdrawn nor dismissed for administrative convenience, and that Martin cannot seek relief in court on the same claims. *See Anderson*, 552 A.2d at 860–62; *accord Adams*, 793 F. Supp. 2d at

**E.  Failure to Provide a Reasonable Accommodation in Violation of the ADA and Rehabilitation Act (Counts Five and Six)**

In Counts Five and Six, Martin alleges that after she was diagnosed with carpal tunnel syndrome, the District failed to provide her with a reasonable accommodation, in violation of the ADA and the Rehabilitation Act, respectively.  *See* Am. Compl. ¶¶ 144–52.[57]

The ADA provides that no covered entity shall "discriminate against a qualified individual on the basis of disability . . . ."  42 U.S.C. § 12112(a).  Such discrimination includes the failure to provide "reasonable accommodations" to a "qualified individual with a disability," unless doing so would constitute an undue hardship.  *Id.* § 12112(b)(5)(A).  In order to make out a prima facie case for a failure-to-accommodate claim under the ADA, a plaintiff must show: (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with or without reasonable accommodation she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.  *See Gordon v. District of Columbia*, 480 F. Supp. 2d 112, 115 (D.D.C.

---

397.  However, Martin did withdraw her first (2010) retaliation claim alleging a reduction in caseload, isolation, and denial of overtime.  *See* Charges, Pl.'s Ex. 68 (indicating that first retaliation claim had a case number of 10-402-DC); Request for Withdrawal, Defs.' Ex. F (confirming withdrawal of case number 10-402-DC).  The Court declines to decide the applicability of the DCHRA forum choice provision, given that such analysis would implicate the preliminary question of which claims were timely withdrawn and which were decided by the DCOHR.  Even if none of Martin's DCHRA retaliation claims were barred by the DCOHR adjudication, the Court would grant summary judgment to Defendants on Count Four for the reasons explained above.

[57] As explained above, the Court dismisses Count Five as to the individual defendants given that they cannot be liable in their individual capacity under the ADA.  *See supra* Part IV.B.2.  Previously, the Court granted an unopposed motion to dismiss Count Six of the amended complaint as to the individual defendants.  *See* Order, ECF No. 39.  Thus, the District is the only remaining defendant on the failure-to-accommodate claims in both Counts Five and Six.

2007).[58]  The ADA's standards likewise govern failure-to-accommodate claims under the

Rehabilitation Act.  *See* 29 U.S.C. § 791(f); *see also Solomon v. Vilsack*, 763 F.3d 1, 5 (D.C. Cir.

2014).

In its motion, the District contends that it is entitled to summary judgment on the failure-

to-accommodate claims because the fact that Martin received a reasonable accommodation is

undisputed.  Mem. Supp. Mot. Dismiss & Summ. J. 18.[59]  The Court disagrees.  An

accommodation is reasonable if it allows the employee "to perform the essential functions of the

job."  *Norden v. Samper*, 503 F. Supp. 2d 130, 145 (D.D.C. 2007); *see also* 29 C.F.R.

§ 1630.2(o)(1)(ii).  While it is undisputed here that the District provided Martin with a cassette

recorder, the District fails to explain how the recorder enabled Martin to perform the "essential

functions" of her position.  *Norden*, 503 F. Supp. 2d at 145.[60]  Record evidence could support

---

[58] Both parties here rely on *Gordon*, and this Court adopts its test, with the modification that for purposes of establishing a prima facie case, a plaintiff must be able to perform her job functions "with or *without* reasonable accommodation."  42 U.S.C. § 12111(8) (defining "qualified individual") (emphasis added); *see also Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007) (articulating two prima facie elements—(1) that plaintiff is a "qualified individual with a disability" and (2) that defendant failed to provide the necessary "reasonable accommodations"—but noting that the two elements are "interconnected" since status as qualified individual depends on ability to perform tasks with the reasonable accommodation); *Norden v. Samper*, 503 F. Supp. 2d 130, 144 (D.D.C. 2007).

[59] The District submits, alternatively, that Martin's alleged impairment of carpal tunnel syndrome does not qualify as a disability under the ADA.  The Court has already rejected this argument, concluding that Martin's evidence could support a finding that she was disabled.  *See supra* Part IV.B.2.a.

[60] The District additionally asserts that Jackson told Martin that he "would get her cases typed for her even if he had to type them himself."  Mem. Supp. Mot. Dismiss & Summ. J. 18 (citing Jackson Aff. ¶ 7, Defs.' Ex. I).  This claim is not supported by Jackson's affidavit, which indicates only that Jackson "provided [Martin] with a dictation machine where [sic] she was only required to dictate her cases into the recorder."  Jackson Aff. ¶ 7, Defs.' Ex. I.  In any event, Jackson's purported claim is directly contradicted by Martin's evidence: Demetrius Nickens's affidavit states that Jackson told him that he "would be required to type all of Investigator [Martin]'s cases in addition to any works [sic] assignments that [he] had."  Nickens Aff. ¶ 7, Pl.'s Ex. 58.

findings that the recorder did not facilitate email communications or typing, both of which were substantial routine tasks for Investigators, and that Martin did not receive the voice recognition software until December 2011. *See* Martin correspondence, Pl.'s Ex. 64; Martin letter of Jan. 2, 2012, Pl.'s Ex. 62; Investigator job description, *id.*; Martin Dep. 33:17–18, Defs.' Ex. Q. The Court concludes that a dispute of fact exists as to whether ABRA's chosen accommodation was "reasonable." *See* Martin correspondence, Pl.'s Ex. 64.[61]

The Court therefore denies the motion for summary judgment as to Martin's failure-to-accommodate claims in Counts Five and Six.

### F. Negligent Hiring and Retention (Count Seven)

Martin alleges in Count Seven that the District and Moosally selected and retained employees who created an environment that promoted discrimination and retaliation. Am. Compl. ¶¶ 153–66.[62] In dismissing Count Seven as to Brodsky, this Court explained that a negligent supervision claim "may be predicated only on *common law* causes of action or duties imposed by the common law." *Martin*, 968 F. Supp. 2d at 166 (quoting *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 576 (D.C. 2007) (per curiam) (emphasis added)). Because Martin's negligence claim is predicated on "various employment causes of action that are creatures of

---

[61] The District does not assert the defense that providing a reasonable accommodation would have imposed an undue hardship. *See* 42 U.S.C. § 12112(b)(5)(A); *Norden*, 503 F. Supp. 2d at 145.

[62] This Count of the amended complaint is brought against the District, Brodsky, Graham, and Moosally. As explained above, this Court previously dismissed this Count as to Brodsky. *See Martin*, 968 F. Supp. 2d at 166. It appears that Martin inadvertently included Graham in the amended complaint; he was voluntarily dismissed from this case in July 2011, nearly nine months before the amended complaint was filed. *See* Minute Order Granting Councilmember Graham's Motion to Dismiss as Conceded, July 27, 2011 (granting Graham's Mot. Dismiss, ECF No. 8). Thus, the only remaining defendants on Count Seven are the District and Moosally.

statute, not common law," this Court dismissed Count Seven as to Brodsky. *Id.* For the same

reason, this Court now dismisses Count Seven as to the District and Moosally.[63]

### G.  Retaliation in Violation of the D.C. Whistleblower's Protection Act (Count Eight)

In Count Eight, Martin alleges that Defendants retaliated against her because of her

participation in the DCOIG investigation, in violation of the DCWPA. *See* Am. Compl. ¶¶ 167–

87.  The alleged retaliation includes threatened and actual disciplinary action, reprimand,

negative personnel decisions, involuntary transfers, denial of promotion and training,

reassignment, and ostracizing. *See* Am. Compl. ¶ 183; D.C. Code § 1–615.52(a)(5) (defining

"prohibited personnel action").

In their motion, Defendants argue that Martin's DCWPA claim is untimely and that,

alternatively, it fails on the merits because Martin's evidence cannot establish a causal

relationship between Martin's participation in the DCOIG evaluation and any alleged retaliation.

*See* Mem. Supp. Mot. Dismiss & Summ. J. 13–15.  The Court need not reach the merits because

it agrees with Defendants that Martin's DCWPA claim is untimely.

The DCWPA provides that claims under the statute "shall be filed within 3 years after a

violation occurs or within one year after the employee first becomes aware of the violation,

whichever occurs first."  D.C. Code § 1–615.54(a)(2).  As Martin concedes, "[c]ourts presume

that an employee becomes aware of the [DCWPA] violation at the time that the adverse

employment act occurs." *Clayton v. District of Columbia*, 931 F. Supp. 2d 192, 203 (D.D.C.

2013); *see also* Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 24 (citing *Sharma v. District of*

*Columbia*, 791 F. Supp. 2d 207, 214 (D.D.C. 2011)).  She also does not deny that all of the

---

[63] Martin's opposition does not discuss the statutory source of the duty underlying her claim in Count Seven; instead, she asserts that the District and Moosally's "duty to use reasonable care in selecting and retaining employees" is "inherent in their supervisory position . . . ." Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 22.

alleged retaliatory actions occurred more than one year before June 9, 2011—the date that she initially filed her DCWPA claim. *See* Mem. Supp. Mot. Dismiss & Summ. J. 14; Compl. ¶¶ 181–95 (DCWPA claim in original complaint). Under the presumption that she became aware of the DCWPA violations when the alleged retaliation occurred, her claim would be untimely.

Attempting to avoid this presumption, Martin contends in her opposition that although she was aware of the adverse actions when they occurred, she did not realize that they were retaliatory, and thus actionable under the DCWPA, until she filed her complaint on June 9, 2011. *See* Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 24. In support, she cites further analysis by the Court in *Clayton v. District of Columbia*. There, the Court recognized that "an employee may argue that she did not learn that the action was retaliatory until some later date, and [that] thus, the one-year statutory period began later." *Clayton*, 931 F. Supp. 2d at 203. The Court then assumed the truth of the plaintiff's allegation that she did not discover that a reclassification was retaliatory until a later date—when her termination became effective—and denied the District's motion to dismiss. *Id.* at 204.

Martin's reliance on *Clayton* is misplaced. Because *Clayton* was decided on a motion to dismiss, the Court there had to assume the truth of the plaintiff's allegation that she did not learn that an action was retaliatory until a later time. *See id.* at 197 (discussing motion to dismiss); *see also Iqbal*, 556 U.S. at 678. By contrast, here, the parties have proceeded through discovery. At summary judgment, Martin cannot prevail by resting on an unfounded assertion in her opposition that she did not learn of the retaliatory nature of the actions until the day she filed her complaint in this Court. Rather, she must point to "sufficient evidence supporting the claimed factual dispute . . . ." *Anderson*, 477 U.S. at 249 (citation omitted); *see also Celotex*, 477 U.S. at 324

(explaining that nonmovant must "go beyond the pleadings").  Because she has not done so, the

Court presumes that she learned of the violations when the allegedly retaliatory acts occurred.

*Clayton*, 931 F. Supp. 2d at 203.  And because she learned of the violations over a year before

she brought this action, her claim is untimely.

Accordingly, the Court dismisses Count Eight because Martin filed her claim after the

applicable one-year limitations period had expired.  *See* D.C. Code § 1–615.54(a)(2).

### H.  Retaliation for Exercise of First Amendment Rights, in Violation of 42 U.S.C. § 1983 (Count Nine)

Martin alleges in Count Nine that Defendants retaliated against her for various activities

protected by the First Amendment, in violation of 42 U.S. C. § 1983.  *See* Am. Compl. ¶¶ 188–

96.  Although the amended complaint alleges numerous acts of both protected speech and

retaliation, the Court concludes that Martin's claim cannot proceed because she has failed to

introduce evidence that any of her speech is protected by the First Amendment.[64]

---

[64] Because the Court concludes that Martin's speech was not protected by the First
Amendment, it declines to address the District's alternative argument that it cannot be liable
under § 1983, on the basis that Martin's evidence does not establish that any official "policy or
custom" caused the alleged retaliation. Mem. Supp. Mot. Dismiss & Summ. J. 16–17 (quoting
*Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978)).

The individual defendants have not adequately asserted any defense of qualified
immunity given that their motion contains no discussion of the issue, and their answer asserts
only a general defense that "Plaintiff's claims may be barred as to Individual District Defendants
based upon their qualified immunity."  Answer to Am. Compl. 53, ECF No. 35; *see also Sales v.
Grant*, 224 F.3d 293, 296 (4th Cir. 2000) (holding that qualified immunity not preserved for
appeal where defendant "only cursorily references qualified immunity in his answer . . . and
thereafter fails to mention, let alone seriously press, his assertion of that affirmative defense").
Moreover, because qualified immunity would shield the individual defendants only from
monetary damages, and not the District from Martin's § 1983 claims or from her request for
declaratory and injunctive relief, the Court opts not to resolve Martin's claims on this basis. *See
Meredith v. Fed. Mine Safety & Health Rev. Comm'n*, 177 F.3d 1042, 1049 (D.C. Cir. 1999)
(explaining that qualified immunity "does not extend to a suit seeking equitable relief"); *see also*
Am. Compl. ¶ 196 (seeking "equitable and other relief" on Count Nine); *id.* ¶ 211 (prayer

In the D.C. Circuit, courts apply a four-prong test in evaluating a government employee's First Amendment retaliation claim:

> First, the public employee must have spoken as a citizen on a matter of public concern. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. Third, the employee must show that [her] speech was a substantial or motivating factor in prompting the retaliatory or punitive act. Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.

*Bowie v. Maddox*, 642 F.3d 1122, 1133 (D.C. Cir. 2011) (quoting *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007) (citations, alterations, and internal quotation marks omitted)). "The first two factors . . . are questions of law for the court to resolve, while the latter are questions of fact ordinarily for the jury." *Wilburn*, 480 F.3d at 1149 (citation omitted). The first factor, in turn, consists of two distinct inquiries that inform the Court's analysis below—whether the employee spoke as a citizen, rather than as a government employee,[65] and whether the speech addressed a "matter of public concern." *See id.*

---

seeking "[d]eclaratory and injunctive relief that declare the acts or policy of the Defendants' [sic] unconstitutional"). The Court notes, however, that for purposes of a qualified immunity analysis, the test articulated in *Winder* would have been "clearly established" law, even though Martin's October 2008 denial of promotion (the first alleged retaliation) occurred before *Winder* was decided in 2009. *See Mpoy v. Rhee*, 758 F.3d 285, 295 (D.C. Cir. 2014) (explaining that although alleged retaliation occurred in July 2008, before *Winder* was decided in 2009, the test of *Winder* was still clearly established law because "*Winder* said that the test it was articulating was the consistent holding of '[D.C. Circuit] cases applying *Garcetti*,' and all of the cases *Winder* cited were decided before" the retaliatory act (citation omitted)). By contrast, *Lane* would not bear on qualified immunity: Because that case was decided after the events in this case and does not purport to be consistent with prior decisions of the D.C. Circuit, it cannot constitute law that was clearly established "at the time of the challenged conduct." *Taylor v. Reilly*, 685 F.3d 1110, 1113 (D.C. Cir. 2012) (citation omitted).

[65] The First Amendment governs the government's restriction of citizen speech, not of its own speech. Where a public employee speaks in her capacity as an employee rather than as a citizen, she is speaking on behalf of the government, and her employer can limit that speech

1.  DCOIG Interview

The allegedly protected speech upon which Martin's First Amendment claim primarily

relies is her report to the DCOIG Special Agent that Delaney had directed that unfavorable

investigative reports be altered to protect certain licensees.  *See* DCOIG Memorandum of

Interview, Pl.'s Ex. 20; Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 27.  For the reasons given

below, Martin has failed to offer evidence that could support a finding that she spoke "as a

citizen" during her DCOIG interview.  *Bowie*, 642 F.3d at 1133.[66]

---

without running afoul of the First Amendment.  *See Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006) ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created.").

[66] Two other instances of allegedly protected speech—one alleged by Martin, and one alleged by Defendants—concern the same content and occurred under similar circumstances for the purposes of this analysis.  In her Statement of Facts, Martin contends that she "again" asserted claims made during her June 2008 DCOIG interview during a November 2008 interview with another DCOIG official.  Pl.'s Am. Statement of Facts ¶ 27.  This assertion is not substantiated by record evidence, which establishes only that Martin met with the DCOIG official.  *See* Martin-Gaines emails of Nov. 2008, Pl.'s Ex. 26, ECF No. 128-26.  Even if she did make the same allegations "again," the Court's analysis would be unchanged: The speech would still have been "pursuant to" her job duties.  *Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009).

Defendants allege in their Statement of Facts that in late July 2008, Martin sent an anonymous letter to the ABC Board complaining about low employee morale and poor management practices at ABRA, which also stated that "some people are asked to change some of the reports that they do, to reflect something that didn't occur or did, depending on the situation."  Letter to ABC Board, Defs.' Ex. C, ECF No. 118-6; *see also* Defs.' Statement of Facts ¶ 10.  Martin does not claim authorship of the letter.  *See* Pl.'s Am. Statement of Facts ¶ 23 ("[A]nother anonymous letter . . . was received by the ABRA Board.").  In her opposition, she claims that she gave information "to the Board" and "report[ed] to the Board," but whether these statements refer to her DCOIG interview is unclear.  Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 27.  Even if Martin did author the letter, the Court's analysis would be unaffected: The overall "context" of the letter—written by an employee (though anonymously), seeking redress though a perceived internal channel, and almost entirely voicing complaints about the ABRA working environment—renders it unprotected employee speech.  *Mpoy*, 758 F.3d at 292–94; *see also infra* (applying *Mpoy*'s contextual test to Martin's speech during her DCOIG interview).

In *Winder v. Erste*, 566 F.3d 209 (D.C. Cir. 2009), the D.C. Circuit considered whether a school district employee spoke "as a citizen" when he criticized his supervisors in several forums.  Winder's primary job duty was to facilitate the school district's compliance with court orders mandating transportation services for special education students.  Over time, Winder came to believe that his supervisors were frustrating this compliance and reported his supervisors' conduct to the court-appointed Special Master, to the D.C. Council, and to the DCOIG.  *Id.* at 211–12.  On appeal, the D.C. Circuit reasoned that "Winder was hired to help [the district] comply with the . . . court orders," and that "in each communication at issue . . . he acted in furtherance of that duty by exposing the efforts of [district] officials to block compliance."  *Id.* at 214–15.  Reviewing this Circuit's prior applications of *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which rendered unprotected public employees' speech made "pursuant to their official duties," *id.* at 421, the *Winder* court held that Winder's testimony was not protected because it "report[ed] conduct that interfere[d] with his job responsibilities."  *Winder*, 566 F.3d at 215.  In reaching this conclusion, the court rejected Winder's submissions that he ventured "outside his chain of command," and that "his supervisors . . . did not want him to speak candidly to officials who were reviewing . . . compliance with the [court] orders."  *Id.* at 215.  At the same time, the court disapproved of the sweeping proposition that any speech that merely "concerns" an employee's job duties is unprotected.  *Id.* at 216 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

Applying *Winder*, this Court concludes that Martin has failed to introduce evidence that she spoke "as a citizen" during the June 2008 DCOIG interview.[67]  Like Winder, Martin was

---

[67] Defendants have not disputed that the subject of Martin's speech—ABRA management's altering investigative findings to protect certain licensees—was of "public concern."  *See Lane*, 134 S. Ct. 2369, 2380 (2014) (concluding that testimony about "corruption

speaking "pursuant to" her job duties by "report[ing] conduct that that interferes with [her] job responsibilities . . . ." *Id.* at 215. Investigators are tasked with inspecting licensees and reporting potential violations of the District's alcohol regulations. *See* Investigator job description, Pl.'s Ex. 62. In alerting the DCOIG to her belief that Delaney was altering findings of Investigators in favor of certain licensees, Martin "acted in furtherance of [her] duty by exposing the efforts of [ABRA] officials" to frustrate her investigations and the enforcement of the alcohol regulations. *Winder*, 566 F.3d at 214–15. Although Martin's evidence shows that her allegations took place "outside [her] chain of command," and that her superiors "did not want [her] to speak candidly to officials" auditing ABRA, *Winder* deemed the same circumstances unavailing. *Id.* at 215.[68]

As Martin correctly notes, however, *Winder*'s approach comes into potential tension with the recent Supreme Court decision of *Lane v. Franks*, 134 S. Ct. 2369 (2014). The D.C. Circuit noted this tension in its dicta in *Mpoy v. Rhee*, 758 F.3d 285 (D.C. Cir. 2014):

> [I]t is possible that *Winder*'s broad language, interpreting *Garcetti* as leaving an employee unprotected when he reports conduct that "interferes with his job responsibilities," 566 F.3d at 215, could be in tension with *Lane*'s holding that an employee's speech is unprotected only when it is within the scope of the employee's "ordinary job responsibilities," 134 S. Ct. at 2379–80, or "ordinary job duties," *id.* at 2378. In particular, the use of the adjective "ordinary"—which the court repeated nine times—could signal a narrowing of the realm of employee speech left unprotected by *Garcetti*. Neither *Garcetti* nor any other previous Supreme Court case had added "ordinary" as a qualifier.

---

in a public program and misuse of state funds . . . obviously involves a matter of significant public concern").

[68] Martin's evidence could support a finding that both Delaney and Jackson were at least aware of and uneasy about Martin's participation (or attempted participation) in the DCOIG evaluation: In June 2008, Martin asked Delaney how to schedule a meeting with DCOIG investigators, and Delaney, after informing Martin that the DCOIG would initiate contact, subsequently forwarded the exchange to Jackson with the preface "Fyi." *See* Martin-Delaney emails of June 20, 2008, Pl.'s Ex. 18.

*Mpoy*, 758 F.3d at 295 (citation omitted).  After noting these doubts about *Winder*, the *Mpoy*

court declined to resolve the tension and decided the case on qualified immunity grounds.  *See*

*id.* at 289; *see supra* note 64.

      Martin contends that under *Lane*, as interpreted in *Mpoy*, she spoke outside the bounds of

her "ordinary" job responsibilities "by voluntarily disclosing protected information to the Board

and to the OIG."  Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 27.  She submits in particular that her

DCOIG interview could not have been part of her ordinary duties given that it took place "in the

course of a special, *ad hoc* investigation."  *Id.*

      In *Lane*, the Supreme Court considered whether the First Amendment protected a public

employee's testimony in a criminal trial, where such testimony was not a routine part of the

employee's job function.  An Alabama community college hired Lane to oversee a statewide

program for underprivileged youth, giving him authority over the program's daily operations,

personnel matters, and finances.  *Lane*, 134 S. Ct. at 2375.  In this capacity, he conducted an

audit of the program's finances and discovered that an Alabama State Representative on the

program's payroll had not been reporting to her assigned office.  Although college officials told

him that firing the State Representative could lead to "negative repercussions" for both him and

the college, he proceeded to terminate her anyway, prompting a subsequent federal investigation

into the Representative leading to criminal charges for mail fraud and theft concerning a program

receiving federal funds.  *Id.*  At the State Representative's trial, Lane testified under subpoena

about the events leading to her termination, and the jury returned guilty verdicts on nearly all

counts.  *Id.*  Months later, Lane was terminated.  *Id.* at 2376.  He then sued his supervisor under §

1983, alleging that he was fired in retaliation for his trial testimony, in violation of the First

Amendment.  *Id.*

The *Lane* Court reaffirmed *Garcetti*'s functional inquiry into whether a public employee's speech occurred "pursuant to [his] official duties." *Lane*, 134 S. Ct. at 2378; *see also Winder*, 566 F.3d at 215.  In doing so, however, the Court opted for different language in describing the *Garcetti* Court's "[a]ppl[ication of] that rule": "[T]he [*Garcetti*] Court found that an internal memorandum prepared by a prosecutor in the course of his *ordinary job responsibilities* constituted unprotected employee speech." *Lane*, 134 S. Ct. at 2378 (emphasis added).  The *Lane* Court ultimately held that "truthful sworn testimony, compelled by subpoena, outside the scope of [the employee's] ordinary job responsibilities" is protected citizen speech. *Id.*

The *Mpoy* court explained that *Lane*'s "use of the adjective 'ordinary' . . . could signal a narrowing" of the space of unprotected speech under *Garcetti*.  *Mpoy*, 758 F.3d at 295.  That is, *Lane* could be read to mandate a more descriptive, rather than normative, inquiry: The speech act must "itself" constitute part of the speaker's "ordinary" job duties, regardless of whether the speech furthers those duties.  *Compare Winder*, 566 F.3d at 214–15 (holding that speech "in furtherance of" or "pursuant to" job responsibilities is unprotected), *with Lane*, 134 S. Ct. at 2379 ("The critical question under *Garcetti* is whether the speech at issue is *itself ordinarily* within the scope of an employee's duties . . . ." (emphasis added)).

However, the *Mpoy* court noted in the paragraph immediately preceding its discussion of the *Lane–Winder* tension that because both the *Lane* and *Garcetti* Courts "had no occasion to consider how the scope of [ordinary job] responsibilities should be determined in other circumstances," *Lane* "does not directly or necessarily contradict *Winder*'s application of *Garcetti*." *Mpoy*, 758 F.3d at 294.  Indeed, the *Lane* and *Garcetti* Courts expressly reserved the question of how to define a speaker's job duties.  In *Garcetti*, because the parties agreed that the

speech at issue was "pursuant to" the speaker's job duties, the Court had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate," and emphasized only that the "proper inquiry is a practical one" that cannot rely solely on tasks listed in a job description. *Garcetti*, 547 U.S. at 424. In *Lane*, too, the scope of employment duties was not at issue because the parties agreed that "Lane's ordinary job responsibilities did not include testifying in court proceedings." *Lane*, 134 S. Ct. at 2378 n.4.

This Court thus agrees that *Winder* addresses a question not yet resolved by the Supreme Court: What characterizes speech that is "itself *ordinarily* within the *scope* of an employee's duties" and thus unprotected under *Lane*? *Id.* at 2379 (emphasis added). The answer preferred by Martin is that the activity giving rise to unprotected speech must occur with some degree of frequency in the course of "ordinary" duties. *Cf. Lane*, 134 S. Ct. at 2384 (explaining that *Lane* did not implicate public employees for whom "testifying is a routine and critical part of their employment duties," such as "police officers, crime scene technicians, and laboratory analysts") (Thomas, J., concurring).[69] But under *Winder*, any speech that furthers those "ordinary" duties

---

[69]Indeed, under this view of *Lane* and *Garcetti*, Martin's speech could very well be protected. First and foremost, the record evidence of rumors and discontent precipitating the DCOIG evaluation supports Martin's contention that she spoke "in the course of a special, *ad hoc* investigation." Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 27. In response, Defendants contend that in her deposition, Martin testified that she was required to "cooperate" with the DCOIG evaluation. *See* Martin Dep. 102: 11–13, 103: 15–18, Defs.' Ex. B; *cf. Garcetti*, 547 U.S. at 422 ("The fact that [the deputy district attorney's] duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance."); *accord Lane*, 134 S. Ct. at 2379. But the very same deposition creates a dispute of material fact: During the course of advising all ABRA employees of their duty to "cooperate" with the DCOIG evaluation, Jackson also told ABRA employees to "remove everything from their desk" that might reveal improper relationships with licensees, and to "sanitiz[e]" the office. Martin Dep. 103: 8–14, 104: 13–17, Defs.' Ex B. Even if Martin was required to "cooperate" with the DCOIG interview, it appears that she went beyond the required cooperation in providing the comments at issue. The goal of the DCOIG interview was to determine whether Delaney and

by attempting to eliminate interference would fall within the "scope" of those duties and thus also be unprotected. 566 F.3d at 214–15.[70]

Even if Martin is "correct in predicting the Supreme Court's response to questions not yet before it, this Court cannot accept [her] invitation to depart from this Circuit's binding precedent." *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 52 (D.D.C. 2013). *Winder* and the principles of *stare decisis* must control: It is a "long-standing rule of the D.C. Circuit" that prior panel decisions are binding unless withdrawn by the panel or overruled by the court sitting *en banc*. *Cobell v. Salazar*, 816  F. Supp. 2d 10, 15 (D.D.C. 2011) (citing *Brewster v. C.I.R.*, 607 F.2d 1369, 1373 (D.C. Cir. 1979) (per curiam)). This Court's duty to apply *Winder* is all the more apparent where the D.C. Circuit has expressly concluded that *Lane* "does not directly or necessarily contradict *Winder*'s application of *Garcetti*." *Mpoy*, 758 F.3d at 294.

The Court addresses one final wrinkle: Although Martin's discussion of *Mpoy* is limited to its dicta concerning *Lane*, certain other aspects of *Mpoy*'s reasoning could also be read to limit the domain of unprotected speech. In that case, Mpoy, a special education teacher, sent an email to the school district chancellor complaining about a host of job-related frustrations. *Mpoy*, 758

---

Jackson had instructed Investigators to destroy evidence relevant to the DCOIG audit. But this matter appears to have no direct bearing on Martin's allegations about Delaney's interference with the investigation of licensees. *See* Memorandum of Interview, Pl.'s Ex. 20. The record thus supports an inference that Martin's allegations were neither part of any required "cooperation" with the DCOIG evaluation nor made in the course of routine, day-to-day duties.

[70] *Winder*'s view of the scope of a speaker's job duties finds a helpful analogy in agency principles governing the scope of employment relationships. *See* Restatement (Second) of Agency § 228 (1958) ("Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master . . . ."); *see also Rasul v. Myers*, 512 F.3d 644, 656–57 (D.C. Cir. 2008) ("To be 'of the kind' conduct an individual is employed to perform, the Restatement explains that the 'conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.'" (citation omitted)), *vacated on other grounds*, 555 U.S. 1083 (2008). Thus, *Lane* leaves to the lower courts the task of determining not only which job duties are "ordinary," but also, relatedly, the "scope" of such duties.

F.3d at 291–92. On appeal, Mpoy contended that one sentence in his email was protected citizen speech—the allegation that his school's principal "misrepresented students' performance and results on" certain tests. *Id.* at 292. The court disagreed. In determining that even this allegation was made "pursuant to his official responsibilities" under *Winder*, the court examined the speech's "context": The vast majority of the email concerned problems specific to Mpoy's classroom, and Mpoy identified himself by his job title, suggesting that he viewed the email as an "internal channel." *Id.* at 292–94.

Notably for purposes of the instant case, the *Mpoy* court also emphasized that "[t]he complaint makes clear that Mpoy was not complaining that the principal had changed the [scores] of any *other* teachers' students," but only those of his own students. *Id.* at 293. Here, Martin alleged during her DCOIG interview that Delaney sought to influence not only Martin's own cases and reports, but also those of the "Investigators" as a whole, such that an "unwritten rule" colored all ABRA reports on certain licensees. DCOIG Memorandum of Interview, Pl.'s Ex. 20. Thus, unlike Mpoy's email, Martin's speech arguably implicated more than her own job duties.

This Court nonetheless concludes that *Mpoy* does not confer First Amendment protection on Martin's speech. Preliminarily, the Court doubts that, under *Mpoy*, Martin's duties can be reduced to the management of her assigned cases alone, given that Investigators have a higher obligation to enforce the law, and that Martin's own evidence shows that collaboration between Investigators was not uncommon. *See* Investigator job description, Pl.'s Ex. 62 (explaining that the Investigator "[p]lans and conducts periodic investigations and inspections . . . *in order to effectively administer and enforce the District of Columbia beverage alcohol laws . . . .*" (emphasis added)); Nickens Aff. ¶¶ 2–3, Pl.'s Ex. 58 (explaining that Nickens worked "together"

with and was trained by Martin).[71]  Even assuming (without deciding) that *Mpoy* does limit

Martin's responsibilities in such a manner, the Court still concludes that, on balance, *Mpoy*'s

other "contextual" factors foreclose a finding that Martin spoke as a citizen: First, like Mpoy, she

spoke in her official capacity in what she perceived to be an internal forum for registering

complaints, and, second, most of her speech targeted interference with her own cases and reports.

*See Mpoy*, 758 F.3d at 292–94.[72]  Crucially, *Mpoy* did not create an exception to *Winder*'s rule

by holding that First Amendment protection is triggered whenever a public employee reports

interference with her duties, if that interference also incidentally obstructs the duties of others.[73]

Here, Martin alleged that Delaney's favoritism affected all "Investigators"—of whom, of course,

she is one.  DCOIG Memorandum of Interview, Pl.'s Ex. 20.  Because *Winder* remains the law in

this Circuit, *see Cobell*, 816  F. Supp. 2d at 15, this Court concludes on this record that Martin

---

[71] Indeed, like the Supreme Court, the D.C. Circuit has also had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties . . . ."  *Garcetti*, 547 U.S. at 424.  *Winder*'s holding that the First Amendment does not protect speech "report[ing] conduct that interferes with [the speaker's] job responsibilities," *Winder*, 566 F.3d at 215, does not fully resolve the fundamental question of how courts should ascertain these duties in the first place.

[72] The DCOIG Special Agent interviewed Martin in her capacity as "Investigator, Enforcement Division," and she expressed to Delaney her interest in speaking to DCOIG even before the interview had been scheduled, demonstrating her belief that the DCOIG interview would provide an internal forum for her complaints.  *See* DCOIG Memorandum of Interview, Pl.'s Ex. 20; Martin-Delaney emails of June 20, 2008, Pl.'s Ex. 18.  Moreover, the bulk of Martin's allegations concern her own cases—in particular her report on the Dancing Crab, for which Martin provided her initial draft marked up by Delaney.  DCOIG Memorandum of Interview, Pl.'s Ex. 20.  To be sure, there is no verbatim account of the DCOIG interview in the record; the Court therefore cannot undertake a more granular assessment of the context of Martin's speech.  *Cf. Mpoy*, 758 F.3d at 293 ("Here, the speech in question was a single sentence consisting of 2.5 lines in a 160–line email; 16 words out of more than 1300.").  But because no party challenges the accuracy of the interview notes' representation of Martin's speech, the Court is bound by the summary judgment record.

[73] In a footnote, the *Mpoy* court added that Mpoy's email did not allege a "grander campaign" affecting the scores of many teachers' students.  *Mpoy*, 758 F.3d at 293 n.4.  The court, however, did not explain how the presence of such an allegation would have changed its analysis, let alone its ultimate holding.

"report[ed] conduct that interfere[d] with [her] job responsibilities," even if that conduct also

happened to interfere with the duties of other Investigators, *Winder*, 566 F.3d at 215.

Accordingly, under *Winder*, the allegation made by Martin during her DCOIG interview

was employee speech unprotected by the First Amendment.  *Bowie*, 642 F.3d at 1133.[74]

### 2.   Other allegedly protected speech

Besides the DCOIG interview, the amended complaint mentions other speech activities—

"opposing perceived discrimination in employment," "obeying a subpoena," "appearing as a

witness to offer testimony," and "reporting to police and cooperating with [p]olice in a criminal

matter involving [I]nvestigator misconduct."  Am. Compl. ¶ 189.

The Court concludes that no other instance of allegedly protected speech saves Martin's

First Amendment retaliation claim.  Martin's discrimination complaints cannot support a First

Amendment retaliation claim because there is no evidence that they extended beyond an

---

[74] Because the Court concludes that Martin's speech is unprotected, it need not address the other three prongs of the First Amendment retaliation test.  *See Bowie*, 642 F.3d at 1133.  The Court notes, however, that these prongs appear to offer Defendants little help.  Under the second prong, Defendants have presented no countervailing government interest in efficiency that would cut against Martin's right to report improper favoritism in regulatory enforcement.  *See Lane*, 134 S. Ct. at 2381 (explaining that "the employer's side of the . . . scale is entirely empty" given the lack of evidence that the government employee's testimony was "false or erroneous" or "unnecessarily disclosed any sensitive, confidential, or privileged information").  Causation is also arguably satisfied under the third prong.  Here, Martin's denial of promotion (October 2008) followed her DCOIG interview (June 2008) by four months, and the Supreme Court has held that such a period, standing alone, would not suffice to establish causation in the retaliation context.  *See Breeden*, 532 U.S. at 273–74 (Title VII retaliation); *Payne v. District of Columbia*, 741 F. Supp. 2d 196, 220 (D.D.C. 2010) (applying temporal proximity analysis of *Breeden* in dismissing First Amendment retaliation claim).  But Martin's evidence shows more than temporal proximity alone: Delaney and Jackson—the same individuals who denied her the promotion—were at least aware of and uneasy about Martin's participation (or attempted participation) in the DCOIG evaluation.  *See* Martin-Delaney emails of June 20, 2008, Pl.'s Ex. 18.  As for the fourth prong, the Court has already concluded that Martin's evidence could support a finding that at least some of the District's proffered nondiscriminatory reasons are pretextual for Title VII purposes, *see supra* Part IV.B, and the same finding would "refute [the District's] showing . . . that it would have reached the same decision in the absence of the protected speech," *Bowie*, 642 F.3d at 1133.

"individual personnel dispute" to reach any "matter of public concern." *Tao v. Freeh*, 27 F.3d

635, 639 (D.C. Cir. 1994) (holding that complaint that agency discriminated against all Chinese-

Americans, directed to agency director, and styled as a "first voice of protest," implicated

matters of public concern and was "broader than an individual employee personnel grievance,"

*id.* at 640); *see also* Charges, Pl.'s Ex. 68 (alleging that Martin had suffered gender, disability,

and age discrimination and retaliation but not alleging systemic problems).  The Court declines

to consider the remaining speech activities—obeying a subpoena, testifying as a witness, and

cooperating with police—because these allegations are unsupported by the record and absent

from Martin's opposition.  *See Celotex*, 477 U.S. at 324 (explaining that party opposing

summary judgment must "go beyond the pleadings").

*          *          *

Martin's First Amendment retaliation claim under § 1983 cannot proceed in the absence

of evidence that could support a finding that any of her speech was citizen speech protected by

the First Amendment.  The Court thus grants summary judgment to Defendants on Count Nine.


## I.  Conspiracy and Failure to Prevent Conspiracy (Counts Eleven and Twelve)

Lastly, Martin alleges in Count Eleven that Defendants conspired to deprive her of the

equal protection of the laws, in violation of 42 U.S.C. § 1985, and, in Count Twelve, that they

failed or neglected to prevent such a conspiracy, in violation of 42 U.S.C. § 1986.  *See* Am.

Compl. ¶¶ 201–208.  In dismissing Counts Eleven and Twelve as to Brodsky, the Court

concluded that the intracorporate conspiracy doctrine foreclosed Martin's claims that Brodsky

conspired with the other individual defendants, who were all "agents of the D.C. government

during the alleged events giving rise to this litigation."  *Martin*, 968 F. Supp. 2d at 169; *see also*

*Tabb v. District of Columbia*, 477 F. Supp. 2d 185, 190 (D.D.C. 2007) ("[A] corporation cannot conspire with its employees, and its employees, when acting within the scope of their employment, cannot conspire among themselves." (citation omitted)).  The parties do not dispute that Moosally, Jackson, Stewart, and Delaney—like Brodsky—are all agents of the District during the period at issue.  *See generally* Am. Compl.  The Court concludes that the intracorporate conspiracy doctrine likewise mandates dismissal of Counts Eleven and Twelve as to Defendants.[75]

**V.  CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss and for summary judgment (ECF No. 118) is GRANTED in part and DENIED in part, and Martin's motion for sanctions and to strike exhibits (ECF No. 131) is DENIED.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 23, 2015                                    RUDOLPH CONTRERAS
                                                                        United States District Judge

---

[75] Martin's failure to address the intracorporate conspiracy doctrine in her opposition to Brodsky's motion effectively conceded the argument there and her failure here does the same. *See* Am. Pl.'s Mem. Supp. Pl.'s Resp. Opp'n 33–34; *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").